IN THE MATTER OF H—— S——.—69 S. W. (2d) 325.

In the St. Louis Court of Appeals. Opinion filed March 16, 1934.

Motion for rehearing overruled March 27, 1934.

PER CURIAM:—This is an original proceeding in this court looking to the disbarment of one H——— S———, hereinafter spoken of as the respondent, who has been duly licensed to engage in the practice of the law in this State. The charges, duly verified and in writing, have been preferred by certain members of the bar in good standing, who constitute the Committee on Grievances of the Bar Association of St. Louis.

The complaint, which is based generally upon the second classification of grounds for suspension or disbarment as the same are enumerated in the statute (Sec. 11707, R. S. 1929; Mo. St. Ann., sec. 11707, p. 626), is that respondent has been guilty of malpractice and misdemeanor in his professional capacity as an attorney-at-law.

Specifically the charge is that in March, 1932, respondent attempted to corrupt and induce one William Van Horn, a member of the metropolitan police force of the city of St. Louis, to violate his duty as a police officer by giving and furnishing to respondent confidential information contained in the official reports of the said Van Horn and other police officers to their superiors and relating to arrests, accidents, and injuries to persons, for the purpose of enabling respondent to prosecute claims and suits for damages against the persons alleged to be legally liable for said accidents and injuries; that as a consideration for the said Van Horn's violation of his duty, respondent offered to pay him the sum of five dollars a week, and as part consideration for information to be thereafter given actually paid Van Horn the sum of five dollars; and that while Van Horn accepted said sum, he did not do so with the intention of complying with the request and solicitation of respondent, but instead reported the matter to his superior officers.

It is further charged that respondent solicited and requested Van Horn to include in his written reports to his superiors of accidents and injuries investigated by him a false statement to the effect that the person or persons responsible for such accidents and injuries did

not carry liability insurance covering his or their liability for the same, in order that such written reports would deceive and mislead other lawyers who might be seeking employment at the hands of such injured persons.

Following the exhibition of the charges in this court, respondent waived the issuance and service of the citation, and duly entered his appearance in the proceeding. Thereafter he filed his return, admitting his license to engage in the practice of the law in this State, but denying generally each and every allegation, statement, and averment in the petition contained, and praying for the dismissal of the petition.

Notwithstanding the joinder of issue on the face of the pleadings, at the hearing on the charges the facts upon which the charges were based were tacitly and in effect admitted by respondent through his counsel, who not only put on no evidence themselves, but did not even cross-examine the two witnesses who were brought forward by complainants. Such witnesses were Officer Van Horn and his wife; and inasmuch as Mrs. Van Horn was used purely for purposes of corroboration, that is, to testify to whatever bits of conversations she had happened to overhear between her husband and respondent, it is obviously Van Horn's testimony alone which is of prime importance.

At the time in question Van Horn resided at 8972 Edna Street, in the city of St. Louis, and was assigned to duty as a patrolman in the fifth police district commanded by Captain Hoagland. About two o'clock in the afternoon of March 21, 1932, Van Horn was home changing his clothing preparatory to reporting for duty, when an automobile containing two men was stopped in front of his house. One of the men alighted from the automobile, and began sounding the horn of Van Horn's own car which was parked alongside the curb at the time. Mrs. Van Horn went to the door and inquired what was wanted, whereupon the one who had been sounding the horn, who seemingly was respondent, replied, "I want to see Bill."

As a matter of fact respondent was not acquainted with Van Horn at all, but was feigning familiarity for the purpose of getting the opportuinty to speak with him. Van Horn did go out to the street, whereupon respondent extended his hand, advising that his name was S———, and that he was an attorney. Van Horn at once disclaimed any acquaintance with him, and inquired what it was he wanted. Respondent thereupon called attention to the fact that he was an attorney, and Van Horn a police officer, and that the latter was on duty in the fifth district, where a great many accidents and police reports came within his observation; and then he stated that he, that is, Van Horn, could make a lot of "easy money." Upon Van Horn's inquiring how this could be accomplished, respondent replied that all he would have to do would be to furnish respondent with information of all accidents.

The conversation closed with a suggestion from respondent that he would again see Van Horn the following day. Van Horn thereupon went to the station, and made a full report of the occurrence to Captain Hoagland.

About one o'clock in the afternoon of the next day, March 22, 1932, respondent again called at Van Horn's home, and after some casual inquiry about the clerk in the fifth district, asked if Van Horn had any accident reports for him. Van Horn replied in the negative, and respondent admonished him to try to get some such reports. This occurrence was likewise reported by Van Horn to Captain Hoagland.

On March 25, 1932, respondent got in touch with Van Horn on the telephone, and arranged to call at his home in half an hour. In due time he arrived at Van Horn's home, and promptly asked if the latter had any police reports for him. There was some further inquiry about the clerk in the fifth district, as well as about the clerks in the fourth and ninth districts, respondent stating that those were good districts for accident cases, and that he would like to get started in them. He told Van Horn that he would not have to be afraid; that his father sold a lot of property to the city for the plaza site; that he was going to have his father qualify as a bondsman; that his nephew or cousin was going to get on the police force; and that he would then have three sources of information on accidents.

It was then that respondent stated that it made no difference in his plans whether the parties were actually injured or not; that he had a ''good doctor'' working with him; and that ''when the doctor got through, the party that was in the automobile accident would have a broken arm or broken leg or something.'' Respondent thereupon handed Van Horn a five-dollar bill, promising to pay him in cash every week, and also to pay for his telephone calls. He suggested that if Van Horn should happen upon a serious accident, he should get in touch with respondent before the patient reached the hospital; and he gave Van Horn his card, saying that he could be reached twenty-four hours a day, and that if he should not happen to be in the office himself when the call came, there would be a girl there to take the message.

After respondent left, Van Horn marked the five-dollar bill for identification, and then turned it over to Captain Hoagland, with a full report of what had taken place. At the hearing on the charges the bill was introduced in evidence as an exhibit for complainants.

It further appears that respondent requested Van Horn to show in each report that the party responsible for the accident carried no liability insurance, so that other lawyers, seeing the official report, would consider that the claim was worthless and make no attempt to get the case.

Not only do respondent's counsel tacitly admit the truth of the

above evidence upon which the charges are based, as we have already pointed out, but they in effect admit that the same constitutes malpractice and misdemeanor in respondent's professional capacity. The submission of the case on their part has not in any sense been upon a denial of any of the testimony adduced on behalf of complainants, but solely by a plea for leniency towards respondent in the entry of our judgment, which, under the circumstances in evidence, was probably the very best they could do in a bad case.

The subject of the power and jurisdiction of the courts in disbarment and kindred proceedings, both inherent and as derived from statute, has recently been so ably and so fully covered by the Supreme Court in In re Richards (Mo. Sup.), 63 S. W. (2d) 672, that any extended discussion on our part of the underlying law of the case would be a work of supererogation. Suffice it merely to say that a disbarment proceeding is one *sui generis,* the purpose of which is not so much to punish as to ascertain those whose conduct has demonstrated their unfitness to practice law, and to deprive them, either temporarily or permanently, of their previously acquired privilege to serve as officers of the court. And it is also important to bear in mind that the terms ''malpractice'' and ''misdemeanor,'' as they are found in the statute, are not used in any technical sense of offenses punishable by fine or imprisonment, but as the equivalent of professional misbehavior. In other words, ''any conduct on the part of an attorney evidencing his unfitness for the confidence and trust which attend the relation of attorney and client and the practice of law before the courts, or showing such a lack of personal honesty or of good moral character as to render him unworthy of public confidence, constitutes a ground for his disbarment.'' [6 C. J. 583.]

Now while a lawyer is not a public officer in the constitutional or statutory sense of the term, he is an officer of the court, and as such owes a definite obligation to the public as a whole in the matter of the proper administration of justice. His license to engage in the practice of the law is his, not of right, but as a privilege granted him by the State, which comes to him burdened with conditions of subsequent good behavior and professional integrity, and sets him and his profession apart from the general public upon a high and dignified plane which is circumscribed by the requirements of good moral character and special qualifications which are prerequisites to admission to the bar.

He enters a profession steeped in high ideals and traditions of unselfish public service, the members of which have left their imprint upon every department of government, and in a very large measure have controlled the progress of government. So great is his responsibility in things political, acting through the judiciary which is his own special sphere in government, that no legislation, no matter how far-reaching or salutary to the common good of the whole people, can

become a fixed and permanent part of our governmental scheme until it has first received the judicial benediction of the highest court in the land.

And in a more special and personal way it is his continuing duty to maintain the high purposes and functions of both bench and bar as instruments of fair dealing between man and man. As an officer of the court he is, like the court itself, an agency or instrument to advance the ends of justice. He serves as a priest in the temple of justice, and if he be false to his vows, then justice itself is imperiled, if not entirely thwarted. He has the property, and sometimes the liberty and the very life, of his client in his safekeeping; and so jealously does the law regard the relation of attorney and client that it puts communications between the two in much the same privileged category as communications between husband and wife. The future of the nation depends very largely upon the maintenance of justice pure and undefiled; and the conduct of the lawyer must support and create confidence in the public mind in the administration of justice, and not be of a character to bring reproach upon the legal profession or to alienate the favorable opinion which the public should entertain concerning it. Failing in this, it is not only within the power, but it is the duty, of the court to remove the lawyer who is false to his trust from the ranks of the profession to the end that the courts, the administration of justice, and the public at large may be protected against him.

How grossly has respondent betrayed the noble heritage that was his! In the most brazen fashion imaginable he has endeavored to induce and bribe a police officer to violate his own duty by furnishing him with advance information of the contents of police reports short of the time, if ever, that they were to be available to the public. In the same fashion he has sought to have the officer falsify the reports as part and parcel of his fraudulent scheme to prey upon the public, and in the hope that such falsification would react to his own selfish, personal gain. One who has so false a conception of the obligations which another man owes to his trust can obviously have no proper conception of the obligations which he owes to his own trust. But perhaps most heinous of all, at least so far as regards the manifestation of his total lack of appreciation of the functions of a lawyer, was the bland statement and confession of respondent to the officer that he had conspired with a doctor to perjure himself by magnifying the injuries present in a given instance, or by manufacturing injuries if none had been sustained, thus evidencing a clearly thought out and prearranged purpose to embank upon a wholesale practice of extortion under the guise of and perpetrated in the name of justice, and one which might easily have been accomplished had not the hand of fate led him to the door of an honest, upright, and fearless man who was

intent upon being true to his trust at all hazards, and unwilling to sell his birthright for a mess of pottage.

Respondent, so far as this record discloses, has given no indication that he realizes the gross impropriety and wrongfulness of his conduct, nor is there anything before us to warrant the view that he has any desire to abide within the limits of his privilege in the future. Though present in court throughout the hearing, and occupying the high and privileged status of an officer of the court, not a word fell from his lips in his own defense or in mitigation or palliation of his misconduct, nor did he himself participate in the making of the plea for leniency towards him. Such defense as was made, which was obviously no defense at all, was that other unnamed lawyers had likewise been guilty of unethical conduct in a greater or less degree without charges having been preferred against them. It is enough merely to observe in this connection that whenever charges of any character are lodged in this court, the court is prepared to deal with them in such manner as the law and the evidence may warrant. Respondent's election to stand mute, and to permit the case to be submitted on his behalf as though he were charged with a crime in a court of criminal causes, has left us with no source of information regarding his antecedents or previous practice. However, having had him before us, we know that he is no stripling at the bar, but a mature man, twenty-eight years of age as his counsel state in answer to the question of one of our number, and obviously fitted by age, training, and experience to have understood and appreciated the highly improper nature of his conduct.

In arriving at our decision in the case it is our duty under the statute (Sec. 11712, R. S. 1929; Mo. St. Ann., sec. 11712, p. 628), to enter a judgment "according to the nature of the offense and as the court may deem just and proper." Respondent has clearly manifested his present unfitness to engage in the practice of the law and to recognize and assume the obligations which the grant of his license has imposed upon him, and no attempt has been made to show that he will be better fitted at any time in the future. The evidence having conclusively demonstrated his unfitness to exercise the duties of the high office of an attorney, there is no alternative for the court but to remove him from the ranks of the profession. On the record before us, nothing short of that will suffice as the necessary consequence of his misconduct, serving at the same time to deter others from entering upon like practices, and to indicate to the laity that the bench and bar are determined to maintain the high standards of the profession.

The judgment of the court is that respondent be removed from the practice of the law in the courts of this State, and that his license to engage in the practice of the law in this State be revoked. It is so ordered.