# MARCH TERM, 1939.

In the Matter of Bert F. Fenn.—128 S. W. (2d) 657.

St. Louis Court of Appeals. Opinion filed April 4, 1939.

*R. Walston Chubb* and *William W. Crowdus* for informants.

*Bert F. Fenn pro se.*

PER CURIAM:—This is an original proceeding in this court upon an information filed with leave of court by the Advisory Committee to the General Chairman of the Bar Committees of Missouri, charging Bert F. Fenn, an attorney residing and maintaining his office in the City of St. Louis, with certain acts of professional misconduct, and praying the court to hear and make such disposition of the case as the facts of the same may warrant.

It appears that the investigation was initiated before the Circuit Bar Committee for the Eighth Judicial Circuit of Missouri, but that upon the subsequent filing by respondent, Fenn, in the Circuit Court of the City of St. Louis, of an action charging three of the members of said Circuit Bar Committee, along with certain other persons,

with slander and conspiracy against him, the case, at the request of said Circuit Bar Committee, was transferred to the Advisory Committee, which thereupon became empowered to sit and act with full powers in lieu of the Circuit Bar Committee before which the case had originated. [Rule No. 36, section 17, Supreme Court of Missouri.]

Thereafter a formal hearing was held before the Advisory Committee after due notice to respondent; and at the conclusion of the hearing, having found that there was probable cause to believe that respondent was guilty of the misconduct charged, the committee prepared and filed in this court an information setting forth in brief form eight separately stated specific acts of professional misconduct charged against him.

A citation notifying respondent of the filing of said charges against him was thereupon issued out of this court and served upon him, in obedience to which he appeared in person and participated in making up the issues, following which the Honorable Charles E. Rendlen, a member of the bar of this court, was duly appointed Special Commissioner with full power and authority to hear the case and report the testimony and evidence taken to the court, together with his findings of fact and conclusions of law.

The special commissioner thereupon qualified and heard the case, and in due course filed his report, finding respondent guilty on five of the counts in the information filed against him, but not guilty on the remaining three counts, and recommending that respondent be suspended from the practice of law in the courts of Missouri for a period of one year. Exceptions were thereafter filed to the report both by the informants and by respondent; and following oral arguments, supported by briefs, both upon the exceptions and the merits of the whole case, the cause has been submitted to the court for the entry of such final judgment by the court as its own findings and conclusions may require.

The information filed by informants charged respondent with having been guilty of professional misconduct in the following particulars:

1. That in 1933 and thereafter respondent carried on his law practice in an unethical and unprofessional manner, in that personally, and through agents and runners, he solicited and induced many persons to assert claims or file suits for alleged personal injuries against their employers or former employers and to engage him to represent them in the preparation and prosecution of such claims and suits; that he agreed with such persons to pay the costs and expenses incident to the prosecution of such claims and suits, including the costs and expenses of medical examinations; and that he advanced money and benefits to the persons so engaging him as their attorney, eleven of whom were specifically named.

2. That in 1933 and thereafter respondent carried on his law busi-

ness in an unethical and unprofessional manner, in that he employed agents and runners as a part and in furtherance of his law business for the purpose of soliciting and inducing persons to engage him as their attorney to make claims and institute suits for and on behalf of such persons against other persons, firms, and corporations, and agreed to pay, and did pay, such runners for their services. That among the agents and runners so employed and used by respondent were Cloid Fahnestock and Noah A. Sparks.

3. That respondent carried on his law business in an unethical and unprofessional manner, in that in the year 1933 and thereafter he agreed to divide fees which he received or expected to receive in the conduct of his law business with persons, including Fahnestock and Sparks, who were not lawyers and were not licensed to practice law.

4. That respondent, prior to the practices above charged, engaged in the unprofessional and unethical practice of law, in that, by his own admissions in testimony given under oath in the case of Adolph Kirschner v. Bert F. Fenn in the Circuit Court of the City of St. Louis, he did, as a matter of common practice in numerous suits mentioned in said testimony, finance and pay doctors' bills and other expenses of litigation out of his contingent fees received in such litigation.

5. That from and after 1933 respondent, in the conduct of his law business, and in the prosecution of claims and suits of various kinds for personal injuries, had, directly and through others, unethically, unlawfully, and dishonorably encouraged divers persons, including litigants and his own clients, to give false testimony in the prosecution of such claims and suits. Two specific instances of such misconduct were charged, the one in connection with the suit of Gladys Sanders v. S. S. Kresge Company in the Circuit Court of the City of St. Louis, and the other in interviewing a prospective client, Gaston L. Eaton, in the presence of other clients and witnesses.

6. That respondent, by the commission of acts involving moral turpitude, had rendered himself unfit to practice law under license from the Supreme Court of Missouri, in that (a) on or about July 6, 1925, in an application for a marriage license made in Niagara Falls, New York, which application was sworn and subscribed to by respondent, he had falsely, willfully, and intentionally misstated his place of residence and misrepresented that he had been granted a divorce in the previous year in the State of Missouri; and (b) that at the September, 1929, term of the District Court of the United States for the Eastern Division of the Eastern Judicial District of Missouri, the grand jury had returned an indictment charging respondent with having feloniously mailed certain nonmailable matter (a contraceptive) in the United States mails, to which charge re-

spondent entered a plea of *nolo contendere,* and was thereupon sentenced and fined by the court.

7. That respondent, on June 7, 1930, was convicted in said federal court, upon his plea of *nolo contendere,* of a criminal offense involving moral turpitude, to-wit, the offense referred to *supra* in subdivision (b) of Count 6 of the information.

8. That respondent, in violation of the rules of the Supreme Court of Missouri, and in violation of his duty as an attorney to aid and assist in the investigation of complaints and charges against any attorney licensed to practice in the State of Missouri, did unprofessionally, unethically, and without proper inquiry, file a suit for slander and conspiracy in the Circuit Court of the City of St. Louis against certain members of the Bar Committee for the Eighth Judicial Circuit of Missouri, which suit was based upon acts performed by said persons in the exercise of their official duties as members of the Bar Committee in the investigation of complaints and charges against respondent. That at divers times and occasions pending the investigation of such charges and complaints against respondent by the said Bar Committee, he willfully and without reasonable cause charged the members of the committee with unethical conduct.

In his answer, after making certain admissions relative to his own *status* and that of informants, respondent proceeded to set up the following purported defense to the charges made against him in each of the counts of the information:

1. After denying both generally and specifically the several charges of unprofessional and unethical conduct contained in Count 1 of the information, respondent alleged that in 1933 he was representing one Mary E. Kennon and others in claims or suits growing out of a certain automobile accident; that Mary E. Kennon was at the time residing and conducting a store in Esther, Missouri, in a locality or district in which many miners and employees of the National Lead Company resided; that many of such miners and employees were frequent and familiar customers and visitors at the store; that when respondent and his wife called upon Mary E. Kennon at her store in connection with the settlement of her case, a number of those persons who happened to be loitering around the store at the time, acting wholly upon their own initiative, and without solicitation on the part of respondent, approached and spoke to him with reference to claims or suits which might arise in their behalf from the conditions of their employment; and that upon the basis of the statements and representations made to him by such persons, and solely at their solicitation, he accepted employment as their attorney to represent them in the prosecution of their claims or suits.

Respondent further averred that upon his explaining to such persons as his clients that medical and X-ray examinations would be necessary to support their suits, the clients expressed a desire to

obtain such service in the City of St. Louis, whereupon respondent and his wife arranged with physicians in the City of St. Louis to provide such service upon credit to the clients, respondent in no instance undertaking or promising to pay any part of such expense.

2. Respondent denied that he had ever employed agents or runners for the purpose of soliciting or inducing persons to make claims or institute suits, or that he had ever paid, or agreed to pay, any agents or runners for such services.

He specifically denied that he had ever employed either Cloid Fahnestock or Noah A. Sparks as an agent or runner, and then, by way of setting out what he professed to be the true circumstances of his dealings with such persons, alleged that he had filed a suit for Fahnestock against the latter's former employer, the National Lead Company; that the suit, being the first of a number of such suits filed, gained newspaper publicity, as a result of which numerous persons called upon Fahnestock to get respondent's address in order that they might employ him as their attorney in like cases, as they voluntarily proceeded to do; that the National Lead Company, taking advantage of Fahnestock's impoverished condition, induced him to settle his case and, in so doing, to make a false affidavit sustaining the charges in the information with respect to his alleged activities on behalf of respondent and repudiating an affidavit to the contrary which he had previously made exonerating respondent from such charges as involved Fahnestock; and that the Lead Company in like manner, for a consideration to Sparks, who was not a client of respondent, procured an affidavit which tended to sustain the informants' charges with respect to respondent's unprofessional relations with Sparks, but which was contrary to a former affidavit given respondent by Sparks exonerating respondent from having had any such unprofessional relations.

3. Respondent denied specifically all the allegations and charges contained in Count 3 of the information, and by way of explanation of the circumstances involved as the basis for such charges adopted his answer to Count 2 as applying to Count 3 as well.

4. For his answer to Count 4 respondent denied all the allegations and charges in such count, and then, with respect to the admissions contained in his testimony given in the case of Kirschner v. Fenn in the Circuit Court of the City of St. Louis, stated that such payments as he may have made or such allowances as he may have given upon doctors' bills and medical expenses were not made or given in pursuance of any unlawful or improper agreement to support the litigation concerned, but were such as he had had a right to make or allow in the exercise of his discretion in settling with his clients in conformity with good ethics and practice.

5. Respondent denied that he had in any manner encouraged or suggested to his client, Gladys Sanders, that she give false testimony

in her suit against the S. S. Kresge Company in the Circuit Court of the City of St. Louis, and likewise denied that he had solicited, encouraged, or in any manner sought to induce Gaston L. Eaton to give any false testimony. He further denied that he had ever been employed by Eaton as the latter's attorney, but averred that the National Lead Company, for a consideration paid, had induced Eaton and others to make false affidavits containing false and unfounded charges against respondent.

6. With respect to the charge contained in Count 6(a) of the information—that respondent had sworn to false statements in his application for a marriage license in Niagara Falls, New York—respondent denied that he had committed any act of moral turpitude in such connection, but averred that the matters referred to in Count 6(a) had all been of a purely personal nature and in no manner connected with or related to his professional activities as a lawyer.

As regards the charge made against him in Count 6(b) of the information, respondent admitted that in 1929 a federal grand jury had returned an indictment against him as alleged in the information; that he had entered a plea of *nolo contendere*; and that he had been fined the sum of $100, which he had paid. He alleged, however as a defense to such charge, that he had had a relative in the pharmaceutical business; that the nonmailable matter (a contraceptive) had been mailed without the knowledge of either himself or his relative; that rather than have his relative be charged and indicted, he himself had assumed full responsibility for the offense; and that no moral turpitude had been involved in said matter, which had had no bearing upon and no connection with his practice of law, but had been wholly unconnected with and had formed no part of his professional conduct.

7. The answer made by respondent to the charge contained in Count 6(b) of the information was likewise interposed as an answer to the charge of conviction contained in Count 7.

8. With respect to the charge of professional misconduct in having instituted the action for slander and conspiracy against certain members of the Bar Committee engaged in their official capacities in the investigation of complaints against him, respondent denied that the filing of such suit was in violation of the rules of the Supreme Court or that the same was filed unprofessionally, unethically, and without proper inquiry, but alleged that to the contrary, he believed himself to have been entitled to bring such suit by virtue of certain constitutional provisions colorably injected into the case.

He admitted having stated that in his opinion the said members of the Bar Committee had acted unethically in giving publicity to charges made against him by officials of the National Lead Company who had allegedly obtained their information by prices paid to persons for false testimony, a fact which respondent believed that the said

members of the Bar Committee either knew or should have known. And in addition he alleged that the filing of such suit for slander and conspiracy was not an offense, and did not constitute unlawful practice of the law, as was allegedly held by the Supreme Court in a case growing out of the same facts and entitled In re Fenn, 341 Mo. 684, 108 S. W. (2d) 369.

The answer concluded with a repitition of the broad allegation that the testimony and affidavit presented to the Bar Committee as the foundation of the charges lodged against respondent had been corruptly and improperly procured and paid for in money or promises by the National Lead Company through its officers and agents; that the same were procured and furnished, not in the public interest, or in the interest of the bar, but for the purpose of suppressing claims against the Lead Company; and that such evidence was founded upon corruption and bribery, was unworthy of belief, and should not be accepted as the foundation of charges against respondent.

There after informants filed their reply, which was followed in turn by respondent's rejoinder; and with the case thus at issue, the hearing was held before the Special Commissioner pursuant to the power and authority conferred upon him by the order of his appointment.

The special Commissioner found respondent guilty upon Counts 1, 2, 3, 5, and 8 of the information, and not guilty upon Counts 4, 6(b), and 7. No evidence was introduced by informants in support of Count 6(a) in which respondent was charged with having made false statements in connection with his application for a marriage license, and such count was therefore properly dismissed by the Special Commissioner, and is so treated by this court.

Respondent's exceptions, some forty-five in number, all relate in one manner or another to the propriety of the findings of the Special Commissioner upon those counts of the information under which he found respondent guilty. The informant's exceptions, on the other hand, have been taken to the findings under which he found respondent not guilty, as well as to the failure of the Special Commissioner to have recommended the permanent disbarment of respondent rather than a mere suspension of one year.

As was pointed out by the Special Commissioner in his report, Counts 1, 2, and 3 of the information may very handily be considered together, being closely interrelated with one another in that in all such counts respondent is charged with the same general character of unprofessional and unethical conduct, namely, that he had personally and through runners solicited employment by persons having claims against their employers or former employers for alleged personal injuries or occupational diseases; that he had agreed with such persons to pay the costs and expenses incident to the prosecution of their claims and suits, as well as the cost and expenses of medical

examinations in connection therewith; that he had advanced money and benefits to the persons engaging him as their attorney; that he had agreed to pay, and had paid, the. runners in his employ, including Fahnestock and Sparks, for their services in soliciting and persuading certain persons to employ him as their attorney; and that he had agreed to divide fees which he received or expected to receive in his law practice with persons, including Fahnestock and Sparks, who were not lawyers and were not licensed to practice law.

The charges embraced in such counts of the information grow out of the professional activities of respondent in connection with his representation of numerous employees of the National Lead Company and the St. Joseph Lead Company in the prosecution of their claims, whether actual or pretended, for damages resulting from occupational diseases alleged to have been contracted by such persons while employed in the mines of the two companies in St. Francois County, Missouri.

It would appear that by far the large majority of such claims were against the National Lead Company, which ceased operations in St. Francois County in February, 1933, throwing its employees out of work with no prospect of reemployment. Shortly thereafter many of such former employees began asserting claims against the company (as they had the undoubted right to do if their claims were meritorious); and the charge against respondent in that connection is not that he represented such claimants in the assertion of the character of claims they were making against their former employer, but instead that he obtained and conducted their cases in a highly unethical and unprofessional manner so as to have evidenced his total unfitness to be invested with the privileges of the high office of an attorney.

The evidence taken before the Special Commissioner was so voluminous that if the opinion is to be kept within reasonable limits, minute details must be omitted and only the ultimate conclusions stated. It suffices to say, therefore, that there was abundant evidence to show that after respondent entered upon his professional activities in St Francois County, he employed Fahnestock, Sparks, and other former employees of the Lead Company as his runners for the purpose of soliciting cases for him in their respective communities; that he informed his runners that he desired employment in occupational disease cases; that he supplied his runners with pads of blank contract forms, after having instructed them how to fill in the forms whenever a client was obtained; that prospective clients were to be informed that they would be put to no expense, but that all expenses of medical examinations and the like in the conduct of the litigation would be paid in each case out of respondent's 50% contingent fee; and that as compensation for their services in soliciting cases the runners would be paid 10% of respondent's 50% contingent fee,

or, in other words, a fee of 5% of the whole recovery in any case in which a contract was obtained.

It was shown that pursuant to such arrangements Sparks signed up thirty-eight men and brought a total of seventy-five men to St. Louis for medical examinations, while Fahnestock received credit for sixty cases in the sense of being entitled to his agreed share of respondent's fees therein, even though in certain cases the contracts may have been actually written up by some other runner accompaning Fahnestock in soliciting the business. Indeed it appeared that so completely was the matter of contacting prospective clients turned over to the runners that most of the men purporting to employ respondent as their attorney had never even seen him until after they had signed their contracts and had been brought to St. Louis at respondent's expense.

It was also shown that each contract thus signed up had noted upon its face the name of the runner who had secured it, the purpose having been to make a record of the identity of the person who was ultimately to share in respondent's fee in the particular case. During the hearing before the Special Commissioner due and timely notice was served upon respondent to produce such contracts so that they themselves, being the best evidence of their contents, might stand as mute testimonials to either the truth or the falsity of the testimony with respect to what they had contained. One would at once suppose that if the testimony of respondent's former runners was untrue, respondent would not only have welcomed, but indeed would have insisted upon, the production of the contracts as irrefutable evidence of the falsity of a material portion of the testimony which had been offered in support of the charge made against him. Instead, however, he refused to produce them after service of the notice upon him, and by way of excuse for their nonproduction, offered the explanation that in 1937, during his absence from his office on account of illness, his office had been robbed of both money and the contracts. Under all the circumstances such an explanation taxes all credulity, and points to the inevitable conclusion that respondent did not produce the contracts because he knew they would have added the weight of their disclosures to the great mass of evidence with which he found himself already overwhelmed.

By Rule No. 35 of the Supreme Court, prescribing rules of conduct which the court declares to be "the measure of the conduct and responsibility . . . of all lawyers who practice in the State of Missouri," it is expressly said in Section 28 that "it is disreputable [for a lawyer] . . . to breed litigation by seeking out those with claims for personal injuries or those having any other grounds of action in order to secure them as clients, or to employ agents or runners for like purposes, or to pay or reward, directly or indirectly, those who bring or influence the bringing of such cases to his office;"

by Section 34, that "no division of fees for legal services is proper, except with another lawyer, based upon a division of service or responsibility," and by Section 42, that "a lawyer may not properly agree with a client that the lawyer shall pay or bear the expense of litigation."

In the case at bar the Special Commissioner, in his report, took distinct and becoming note of the fact that the testimony of respondent's former runners had been abundantly corroborated by other credible evidence in the case so as to lead to the just, rational, and inescapable conclusion that the charges made against respondent in Counts 1, 2, and 3 of the information were all true and well-founded, except as to the incidental charge of having advanced money or benefits to the persons solicited to employ him as their attorney. If by such latter charge was meant that respondent advanced money to such clients, without promise or expectation of reimbursement, for the payment of expenses arising out of the litigation which were properly chargeable against the clients themselves, then he was consistently guilty of this as well as of the other accusations made against him. Our own reading of the record compels the unavoidable conclusion of respondent's guilt in connection with all the matters charged against him in the first three counts of the information, and this not alone from what appears affirmatively recited in the record on the part of his accusers, but also as an inference fairly and properly deducible from his own failure to have taken the stand to refute the charges made against him.

The case on trial was one involving not only respondent's professional reputation, but indeed his very professional existence. He had been confronted by numerous witnesses and an overwhelming array of facts and circumstances, all pointing unmistakably to his guilt as charged, and leaving no room for a finding exonerating him from blame except by a strong and convincing showing that the evidence for informants, from which they had already found probable cause to believe that he had been guilty of misconduct, was actually not the truth. Under these Circumstances, if such evidence was conceivable untrue (as no one would have known better than he himself), one would at once suppose that the necessity of saving himself from the dire consequences of an adverse finding, to say nothing of the maintenance of his self-respect, would have induced him to welcome the opportunity to take the stand and under oath deny the statements of his accusers.

It is to be born in mind that this is not a criminal case where the failure of respondent to have availed himself of his right to testify is not to be construed as affecting the question of his innocence or guilt, but instead it is proceeding *sui generis* in the nature of an investigation by the court into the conduct of one of its officers, which

is brought in the exercise of the court's inherent disciplinary jurisdiction. [In re Richards, 333 Mo. 907, 63 S. W. (2d) 672.]

With the proceeding neither criminal nor adversary in its character, respondent must have known, or at least he is to be charged with knowledge, that when he failed to take the stand in confutation of material matters reposing so peculiarily within his own personal knowledge or information, a proper and compelling inference was to be drawn that his testimony, if given truthfully, would have resulted unfavorably to him, and that he therefore chose to keep his silence rather than testify falsely and subject himself to a charge of perjury. It is to be observed, however, that while he was very careful to protect himself against any such eventuality, he apparently entertained no similar solicitude in the case of his wife, but instead permitted her to take the stand and attempt, as best she might, to rebut the testimony of his accusers, an act on his part which carries its own condemnation quite aside from any other of the numerous aspects of the case.

It is true that subsequently, in oral argument on his exceptions, when respondent was not under oath and felt no compunctions against breaking his silence in the case, he at last undertook to regale the court with what purported to be his own version of the facts, glibly recounting his story, under the guise of argument, in seeming unmindfulness of the fact that at the time when he should have told his story before the officer charged with the duty of hearing the evidence, he had elected to stand mute in the face of his accusers. In Section 22 of Rule No. 35, the Supreme Court has tersely pointed out that "the conduct of the lawyer before the court and with other lawyers should be characterized by candor and fairness." Conceding that this rule would ordinarily have application in cases not involving the lawyer's professional conduct as the actual point in inquiry, it applies none the less, if not indeed with even greater force, to a proceeding such as this, where the sole matter in issue is that of the lawyer's fitness to retain his privileged status as an officer of the court. Where that is the issue, and the lawyer charged with professional misconduct refuses to testify at the hearing on the charges made against him, not only is his refusal to testify to be taken as a strong circumstance against him, but his silence is in and of itself an act of professional misconduct warranting the severest condemnation of the court. Silence of a lawyer under such circumstances is not only wholly lacking in that "candor and fairness" required by the rule above mentioned, but is tantamount to concealment.

We likewise find that informants sustain the charge embraced within Count 4 of the information, as to which the Special Commissioner made a recommendation of not guilty. This, it will be recalled, was the charge that prior to respondent's unprofessional conduct in connection with the solicitation of claims and suits against the lead com-

panies in St. Francois County, he had, under his own admissions in testimony given under oath in the case of Kirschner v. Fenn in the Circuit Court of the City of St. Louis, as a matter of common practice financed and paid doctors' bills and other expenses of litigation out of his contingent fees received in such litigation.

The sole evidence adduced in support of this count was a deposition of respondent himself which was taken in 1934 in connection with the case referred to, which was seemingly an action by a former clerk in respondent's office to recover fees and commissions alleged to have been due on certain cases handled through the office. During his examination by Kirschner's attorney, respondent testified that his average net profit on a case was 20% after the payment of all expenses out of his 50% contingent fee; that in numerous cases specifically mentioned, and inferentially as a matter of common practice, he had had the same kind of contracts obligating him to bear the expenses of the litigation out of his share of the recovery; that the expenses thus to be borne by him included doctors' bills; and that he had a "regular system" for paying doctors for the work they did in a case preliminary to trial as well as for testimony given in court.

Granting that the charge against respondent in Count 4 of the information is of minor consequence as compared with certain of the other accusations made against him, the proof of it nevertheless shows a disregard of long standing for the ethics of the profession, and is therefore not without significance upon the ultimate question of the disciplinary action to be taken.

This brings us to a consideration of the charge embraced in Count 5 of the information, which we regard as the gravest of all the charges made, being an accusation that respondent was guilty of having suggested to his clients, either directly or through other persons, that they give false testimony in the prosecution of their claims and suits.

No more serious charge can be made against a lawyer than that he has encouraged his clients or witnesses to testify falsely in litigation intrusted to his care. Such conduct offends against common decency and honesty, corrupts the administration of justice, and undermines the faith of the people in the courts and in the legal profession. Perjury is abhorrent by whomsoever it may be committed, and when it is suborned by one of the court's own officers who has been specially invested with all the high privileges of a member of the bar, there can be no condonation of the lawyer's betrayal of his trust, and the court, if it is to be an instrument of justice and a shield of protection to the people, can have no alternative but to remove him from the ranks of the profession.

The Special Commissioner found respondent guilty under Count 5 of the information, at least in certain instances and particulars, and our only disagreement with the Special Commissioner's findings is with respect to his interpretation of numerous letters written by

respondent to his local St. Francois County associate, one Berghaus, and others. When those letters are read in the light of the other evidence in the case concerning the matters to which they related, they cannot be otherwise construed than as having constituted open and undisguised suggestions on respondent's part that his clients be instructed and coached to commit perjury, if necessary to establish the existence of a cause of action or avoid the bar of the statute of limitations.

On repeated occasions respondent wrote Berghaus to "drill" in the minds of the men, preparatory to the taking of their depositions or the trial of their cases in the circuit court, that while they may have commenced to feel badly at some time more or less remote, they did not become aware of their real conditions until they were subsequently examined by some physician.

Berghaus testified that being convinced that the Statute of Limitations had run as to certain of respondent's pending cases, he had advised respondent to that effect, and in response had received the following letter from respondent:

"Drill these men on Statute of Limitations.

"They never felt pain in their chest until about 3 - 4 or 6 mths, not later than 6 months before they were XRay and Ex in St. Louis.

"Get that in their mind from 3 - 4 or 6 months by XRay in St. Louis.

"No matter when they quit job that is when they 1st felt pain and when XRay & Ex when they 1st knew their trouble. Sec. 860, R. S. 1929."

According to Berghaus, at least two of respondent's clients, after they had themselves received letters from respondent instructing them as to what their testimony should be in order to avoid the Statute of Limitations, came to his office and told him that the testimony they had been directed to give was not "their true state of affairs." Berghaus relayed all such information on to respondent, and one of the clients, a man by the name of Lincoln, told Berghaus that he had himself informed respondent that such testimony would not be true. However it would appear that respondent was neverthe less insistent that Lincoln should follow his suggestions, as was evidenced by the following letter to Berghaus concerning Lincoln's case:

"Your statement that he noticed pains in his chest several months before his case was filed in 1933 is O. K., then of course he didn't know positively until he was examined what caused those pains. Tell him he must remember that way."

Other letters from respondent purported to suggest specific answers which his clients should make to particular questions, as, for instance, if they were asked when they first knew that they were sick, "Make it some time prior to July, 1931, but I did not know

what was the matter with me." Then if asked when they found out that they were suffering from pneumoconiosis and the like, the answer should be, "Not until some time in September, 1933." Respondent's added explanation was, "That brings them within the law, otherwise the one year statute would apply."

In the case of one Asher, who was being instructed by respondent how he should fill out a claim for compensation under the Workmen's Compensation Law, respondent wrote him to state, among other things, the nature of his permanent injury, and "make it bad."

In the case of one Guitar, for whom respondent had brought an action against the National Lead Company, respondent told him that it was up to him to help make his case, and that he should testify that he had night sweats, chest pains, and headaches, although, according to Guitar, he actually did not have any such conditions.

One McBride testified that after having been solicited by respondent's runner, Sparks, he was brought to St. Louis by the latter for a medical examination, following which he was taken out to respondent's home (where he first met respondent) for the purpose of being schooled by respondent as to how to act in court in the event that his case was brought to trial. According to McBride, he and the other clients present were instructed by respondent that if they got into court they should cough, be nervous, and appear to be in pain, although, in his own case at least, he had no such pain or other conditions.

The record includes still other equally pertinent examples of the coaching of clients and witnesses which might well be mentioned did not the necessity for reasonable brevity forbid. We appreciate that before a lawyer goes into the trial of a case it is not only his right, but indeed his duty, to go over with his client and witnesses the nature of the testimony that will be given so that the lawyer, being informed of what evidence is available, may be put in a position to present the case with proper emphasis upon persuasive facts. Not only is such a course within the range of legitimate advocacy, but the lawyer owes it to both himself and his client to inform himself about all the material facts so as to be able to try the case in the best fashion it permits. We are convinced, however, that respondent's letters and instructions to Berghaus and others are not to be held subject to any such favorable construction. It is all too evident from the entire record in the case that respondent appreciated the difficulties he would meet in making cases for the jury, and was insistent that the true, but adverse, facts of any particular case should not be allowed to stand in the way. Obviously he intended that his clients should be instructed to swear to falsehoods if only by that means could issues be raised for the determination of the jury, and by his own letters he stands convicted of the charge which the informants have lodged against him.

In addition to the blanket charge—substantiated by respondent's own letters and suggestions to Berghaus and others—that he had encouraged his clients to give false testimony in the prosecution of their claims and suits, Count 5 contained two specific charges of such misconduct on the part of respondent, the one in the case of his relations with a prospective client, one Gaston L. Eaton, and the other in the case of his handling of an action brought by him on behalf of Gladys Sanders against the S. S. Kresge Company in the Circuit Court of the City of St. Louis.

It appears that after an investigation had been begun by the Bar Committee with respect to the matter of respondent's professional conduct, he prepared and sent Eaton an affidavit which he requested Eaton to execute, the purport of the same being to exonerate respondent from the charge of any misconduct in his relations with Eaton.

By such affidavit respondent would have had Eaton swear, among other things, that he had employed respondent to represent him (notwithstanding respondent's subsequent allegation in his answer herein that Eaton "was not a client of accused"); that respondent had not solicited his case; that he had personally related to respondent the conditions under which he had worked and the nature of his complaints; that neither respondent nor any one for him and asked him to lie or commit perjury in regard to his claim; and that neither respondent nor any one for him had suggested to him that he pretend to cough or act sick or claim pains which he did not have.

At the conclusion of the affidavit as prepared by respondent was a paragraph by which Eaton would have purported to represent that he had signed the affidavit after reading its contents, and because it stated the truth and the facts as they were in regard to his relations with respondent.

Eaton refused to sign the affidavit, and at the hearing before the Special Commissioner, when he was subjected to a vigorous cross-examination in regard to the truth of its contents, he denied point-blank the statements therein that respondent had not solicited his case; that he had described the conditions of his employment and the nature of his complaints to respondent; and that neither respondent nor any one for him had asked him to lie or commit perjury in regard to his claim. Instead his answer to respondent was, "You did tell me to lie. You didn't come out and just tell me to lie, but anyway that it what you meant." Eaton then indicated that he was referring to the occasion when he was in respondent's home along with other of respondent's clients from the Lead Belt, at which time, according to his testimony, respondent had positively instructed him that while he was in the court room he should cough and say that he was sick.

The special commissioner found, as also do we, that respondent was guilty of having suggested to Eaton that he should simulate ailments which he did not have, and that he was likewise guilty of having

suggested to his client, Mrs. Sanders, that she give false testimony in connection with her action against the S. S. Kresge Company. :

It appears that Mrs. Sanders, while employed by the S. S. Kresge Company, had had the fingers of her right hand cut off in a bread-slicing machine. She thereafter employed respondent, who filed an action in the Circuit Court of the City of St. Louis, asking damages from the Kresge Company in the sum of $45,000. Desiring to take depositions in the case, and anticipating the possibility of a request for a postponement which he was unwilling to have, respondent amended his petition by reducing the prayer for damages to $3000 so as to forestall the removal of the case to the federal court (upon the ground, we would assume, of diversity of citizenship). Surely enough, the defendant's counsel, upon being employed in the case, and finding that he had another case specially set for trial on the day on which the depositions were to be taken, telephoned respondent and asked that the taking of the depositions be continued until such a time as would be convenient to both counsel.

In the course of the conversation the matter of settlement was brought up, and the defendant's attorney, being disposed to get rid of the case at a reasonable figure, suggested that he might pay as much as $8000 or $8500. Respondent stated, however, that he wanted $20,000 in settlement of the case.

Upon respondent's refusal to consent to a postponement of the taking of the depositions, the defendant's counsel stated that he would file a petition to remove the case to the federal court, whereupon respondent replied that in anticipation of such a move he had already reduced his prayer for damages to $3000 until such time as he could have his depositions taken. Being thus informed, the defendant's counsel, having first obtained his client's authorization, entered his appearance in the circuit court, confessed judgment in favor of the plaintiff and against the defendant in the sum of $3000 and costs, and forthwith paid such amount into court in full satisfaction of the judgment.

At this juncture, when respondent found it incumbent upon him to make some move to escape from the pitfall which he had dug for himself and his client, he filed a motion to set the judgment aside, alleging therein, as one of the grounds therefor, a purported agreement with defendant's attorney to the effect that he would again increase the prayer for damages to $45,000 and continue the taking of the depositions. The Special Commissioner found from all the facts that no such agreement had ever been made.

Notwithstanding such representation in the body of the motion to set aside the judgment, in oral argument upon the same in that case respondent stated to the court that he had merely made a mistake; that it had been his intention to reduce the prayer of the petition to $30,000 instead of $3000; and that the figure of $3000 was a typo-

graphical error. Similarly, in his motions for a new trial and in arrest of judgment he set out that the figure of $3000 was a mistake or a clerical error. Indeed so lightly did he regard the need for consistency in his excuses that when he was subsequently called to account by his client, Mrs. Sanders, he sought to leave the impression that he was quite elated with what he had done, and told her: "This is strictly between you and me. This error was not typographical, as I had my clerk swear to it, but was done intentionally so I could get the Kresge Company to confess judgment. If it was for more than $3000 it would go to the federal court, and I did not want this case there."

Quite aside from any question of the significance of respondent's conduct with respect to the matter in inquiry in this proceeding, one would assume that after his client had been caused to suffer such a serious loss as the result of his own gross negligence in the handling of her case, the very least that might have been expected of respondent would have been for him to have done all within his power to compensate her for the grievous wrong he had done her. Instead, however, he insisted upon taking his usual 50% of the meager $3000 judgment, and at the hearing before the Special Commissioner permitted his wife to take the stand and testify that so delighted was Mrs. Sanders with the judgment thus rendered in her favor that she had not only refused to permit respondent to have it set aside, but had in fact informed him that if he did not accept the $3000, she would go over his head and settle it herself.

The conduct of respondent in the Sanders case, as shown by the evidence as well as the position taken by him, through his wife's testimony, in relation to that case in this proceeding, shows an utter lack of the proper conception not only of the duty of a lawyer to the court, but also of the duty of a lawyer to his client. It clearly evinces a deliberate attitude which, if not followed by the removal from the profession of those guilty of such conduct, would ultimately result in the loss of all respect by the people generally for the administration of justice.

This brings us to a consideration of Counts 6(b) and 7 of the information in which respondent was charged with the commission and conviction of an offense involving moral turpitude, the offense having consisted of the felonious mailing of nonmailable matter (a contraceptive) in the United States mails. The undisputed facts were, as appear from the pleadings in this proceeding, that having been charged with such offense in an indictment returned by a federal grand jury, respondent, in June, 1930, entered his plea of *nolo contendere* in the district court, and was sentenced and fined the sum of $100. The Special Commissioner observed in his report that respondent, in open court, had made the statement, though not under oath, that in the criminal proceeding in the federal court he had

merely assumed the responsibility for his wife, who at that time was operating a company that sent the contraceptives through the mails.

The Special Commissioner found that while this occurrence in the federal court might properly be considered in otherwise weighing respondent's fitness as a lawyer, the offense itself did not involve moral turpitude, being merely *malum prohibitum* and not *malum in se*.

What constitutes moral turpitude can never, in its very nature, be so precisely defined as to leave no room for doubt in particular cases. Its meaning depends upon the existing conception of public morals, and the usual definition of the term is that adoption by our Supreme Court in the case of In re Wallace, 323 Mo. 203, 19 S. W. (2d) 625, which is that "moral turpitude is an act of baseness, vileness, or depravity in the private and social duties which a man owes to his fellow men or to society in general, contrary to the accepted and customary rule of right and duty between man and man." Of similar purport is that portion of Section 47 of Rule No. 35 of the Supreme Court, which provides that a lawyer shall not "by any misconduct, commit any offense against the laws of Missouri or the United States of America, which amounts to a crime involving acts done by him contrary to justice, honesty, modesty or good morals."

With due regard to all such considerations, the conclusion seems inescapable to us that the particular offense of which respondent was convicted in the federal court upon his refusal to contest the charge was one peculiarly involving moral turpitude, in that it offended against modesty and good morals, and constituted an act of vileness and depravity in connection with the discharge of the private and social duties which respondent owed to society. To this extent we must disagree with the findings of our Special Commissioner. Were this the only misconduct with which respondent was charged in this proceeding, the question of the nature and extent of the discipline his offense would merit might very well be affected by the fact noted by the special commissioner—that the offense had occurred more than seven years before the filing of the information in this proceeding, with no disciplinary action ever sought or taken in regard thereto until the matter was embraced within the charges here. All will agree, however, that regardless of the belated inquiry into the matter, respondent's conduct in refusing to contest the charge, which practically, if not technically, was an admission of its truth, was one tending to bring reproach upon the legal profession, so that the same is undoubtedly to be weighed and considered by the court in determining the ultimate question of respondent's fitness to retain his *status* as a member of the bar.

Finally we come to a consideration of the one remaining charge against respondent—that acting unprofessionally, unethically, and without proper inquiry, he brought an action charging certain members of the Circuit Bar Committee with slander and conspiracy in con-

nection with the discharge of their official duties in the investigation of complaints against him.

The special commissioner found, as also do we, that there is nothing in the record to indicate in the slightest degree that the members of the bar committee were not actuated by the highest motives and the utmost good faith in all that they did with respect to their investigation of the charges against respondent; that respondent had not made due, proper, or reasonable inquiry before joining the members of the committee as parties defendant to his action; and that he did not have any credible evidence or basis of fact upon which to predicate his allegations of slander and conspiracy against them. Nor is the propriety of this conclusion in anywise affected by the decision of the Supreme Court in In re Fenn, 341 Mo. 684, 108 S. W. (2d) 369 (a contempt proceeding growing out of his institution of such action), inasmuch as the court in that case expressly withheld its decision on the merits because of the absence from the record of controlling facts for a decision.

Indeed the fact is that respondent's institution of the slander and conspiracy suit was but an initial indication of the course he has elected to pursue throughout this entire proceeding, which has been to endeavor to escape the consequences of his own misconduct by charging fraud, bad faith, and persecution on the part of his accusers. The Supreme Court aptly remarked in the Richards case, *supra,* that "it is an ancient custom of persons accused of wrongdoing to impugn acts and motives of their accusers," to which might well be added the thought that when such a defense is interposed, it is usually because the party interposing it has no better one to offer.

In this case respondent not only complains bitterly of the conduct of the National Lead Company, contending that he is the subject of persecution by that company, but in fact he has now reached the point where he charges the informants, and particularly their attorneys, with all manner of unprofessional and unethical conduct in their presentation of the case against him.

The National Lead Company is not before us as a party to this proceeding, and we are consequently not called upon to pass judgment upon the propriety of any of its conduct with respect to respondent and his representation of those of its former employees who have seen fit to make claims against it. Whatever its conduct may have been—a matter we do not attempt to pass upon or determine—respondent may not justify or excuse his own unprofessional conduct by any claim that the Lead Company was itself guilty of similar practices.

In the case of the informants and their attorneys, however, respondent has not the least vestige of a basis for the calumny and vituperation he has sought to heap upon them. Their task in the preparation and presentation of this case has been not only a most arduous,

but indeed a most unpleasant, one, and they have performed their duties with a candor and fairness bespeaking their own high standing at the bar, and entitling them to this word of approbation by the court. It is enough to say that the high sense of responsibility which they have shown at all stages of this proceeding stands out in bold relief against the sordid mess in which respondent finds himself.

We had occasion to say in the H- S- case (In re H- S-, 229 Mo. App. 44, 69 S. W. (2d) 325) that "while a lawyer is not a public officer in the constitutional or statutory sense of the term, he is an officer of the court, and, as such, owes a definite obligation to the public as a whole in the matter of the proper administration of justice. His license to engage in the practice of the law is his, not of right, but as a privilege granted him by the State, which comes to him burdened with conditions of subsequent good behavior and professional integrity, and sets him and his profession apart from the general public upon a high and dignified plane which is circumscribed by the requirements of good moral character and special qualifications which are prerequisites to admission to the bar."

In the case before us respondent has brazenly and persistently flouted the code of ethics of his profession in a manner calculated, if unrestrained, to bring the bar into public disfavor and disrepute. It was abundantly shown that his was no isolated or occasional case of solicitation, division of fees, and the like, but a wholesale disregard of those rules of conduct which serve as the measure of the conduct and responsibility of members of the bar, who, as officers of the court, are constituted agencies or instruments to advance the ends of justice to the end "that the public shall have absolute confidence in the integrity and impartiality of its administration." And not only was he not content with procuring employment in cases by improper and unethical means, but in the handling of his cases he encouraged false testimony, and then, when finally brought to task for his conduct, immediately set about to secure other false testimony as a means of refuting the charges made against him. He has not hesitated to challenge the motives of those who appear as his accusers, but has declined to avail himself of his right and opportunity to take the stand and under oath deny their accusations. All such conduct on his part, as has been amply shown by the evidence in this proceeding, bespeaks his absolute unfitness to occupy the high office of a lawyer, and leaves the court with no recourse but to remove him from the ranks of the profession.

Counsel for the informants have filed a motion asking that respondent's brief be stricken from the files upon the ground that it is scandalous, scurrilous, and libelous in charging them with improper and unethical conduct. Conceding the very substantial basis for the motion, we nevertheless think that in view of the result to be reached in the case, it may in this instance be overruled.

Informants' exceptions to the report of the special commissioner are hereby sustained; those of respondent overruled; and with all the judges concurring, the judgment of the court is that respondent be removed from the practice of the law in the courts of this State, and that his license to engage in the practice of the law in this State be revoked. It is so ordered.