(No. 33455.—

IN RE BRUNEAU E. HEIRICH, Attorney, Respondent.

*Opinion filed June 15, 1956—Rehearing denied March 20, 1957.*

Davis, J., Hershey, C.J., and Schaefer, J., dissenting.

L. H. Vogel, of Chicago, for respondent.

Charles Leviton, of Chicago, *amicus curiae.*

Per Curiam: This is a proceeding to strike respondent Heirich's name from the roll of attorneys pursuant to Supreme Court Rule 59. On June 29, 1950, a formal complaint was filed by the committee on personal injury practice of the Chicago Bar Association, signed by its chairman, charging in substance, that respondent had been guilty of conduct and practices tending to bring the legal profession into disrepute, and had solicited professional employment directly and by employed runners and touters, and had divided fees for legal services with persons not admitted to the practice of law. The complaint also incorporated a lengthy communication of George Ericksen setting forth the charges with greater particularity. This communication charged the respondent, in substance, with the following misconduct:

1. He improperly solicited cases for Robert J. McDonald and William DeParcq and conspired with McDonald and others to enable McDonald to practice law in Illinois without a license.

2. He improperly solicited cases for himself.

3. He improperly asked clients or prospective clients to solicit cases for him and they did so solicit.

4. He improperly employed professional runners to solicit claims for him and they did so solicit.

5. He made false statements under oath in the case of Stanford v. Pennsylvania R. R. Co. in the court of common pleas of Cambria County, Pennsylvania.

Respondent filed motions in the alternative, to dismiss

and to strike from the files the complaint, which were denied, and a motion for a bill of particulars, which was granted in part. The motion to strike was directed against the unsworn letter of George Ericksen and charged that Ericksen was not a person aggrieved or president of the Chicago or State Bar Association. We believe the committee on grievances properly overruled the above motions and other technical motions presented by the respondent during the course of the hearing. This court, in a similar proceeding entitled *In re Needham*, 364 Ill. 65, at page 68, held: "A hearing in a matter of this kind is not governed by common law rules of pleading or the rules which are observed in criminal cases. (*In re Sanitary District Attorneys*, 351 Ill. 206.) Courts have inherent and summary jurisdiction over attorneys practicing at their bars. (*In re Day*, 181 Ill. 73, 87; *Moutray* v. *People*, 162 Ill. 194.) Jurisdiction was vested in the commission to hear the proceeding. The respondent was given notice of a definite charge against him, was heard in his own behalf, and was deprived of no right to which he was entitled under the law. (*In re Mack*, 360 Ill. 343.) It is asserted that not every member of the commission voted upon the report submitted to the court. That was not essential. The majority of the committee voted for the report, and that was sufficient." In the case of *In re Lenox*, 371 Ill. 505, the respondent filed a motion to dismiss the original complaint on the ground that it was not signed by the complaining party as required by Rule 59 of this court. Thereupon a supplemental complaint signed by the complaining party was filed setting forth the charges in greater detail. The respondent claimed it was error to begin the proceeding on faulty complaint, dismiss it and then proceed upon the unverified complaint without a preliminary hearing or investigation. In answer to such claim, at page 506, this court stated: "This contention cannot be sustained." Also see *In re Carr*, 377 Ill. 140 and *In re Anderson*, 370 Ill. 515.

Respondent filed an answer amounting to a general denial of the charges, and affirmatively alleging that seven major railroads organized and financed an organization known as the Railroad Claims Research Bureau for the purpose of destroying respondent's reputation and practice. It was further alleged that the said Claims Bureau hired George Ericksen to investigate the respondent, and retained Joseph Taussig, a former member of the committee on personal injury practice of the Chicago Bar Association, to make and prosecute the complaint against respondent, and that the instant proceeding is in fact being carried on by certain railroads.

Proofs were then taken by the committee on grievances of the Chicago Bar Association, sitting as commissioners of this court pursuant to Supreme Court Rule 59. Hearings were had at various times from 1951 through 1953. Proofs were closed on October 20, 1953, and the case taken under advisement after oral argument on December 8, 1953. The entire record in the case consists of over 6600 pages and the abstracts filed before us consist of over 1200 pages.

The committee on grievances found that the evidence offered sustained substantially all of the charges against respondent, recommended that the respondent be disbarred, and filed their report in this court.

Respondent has filed exceptions to the report which set forth in substance that the findings of the commissioners were contrary to the weight of the evidence, and further that the entire proceedings were instituted and conducted by paid employees of the Railroad Claims Research Bureau, that some of the commissioners were members of firms in the employ of interested railroads, that the commissioners conducted the hearing in a prejudicial manner, and that evidence was procured by representatives of the railroads by fraud, trickery, deceit and promise of reward, and was unworthy of credence.

"The privilege of appearing as an attorney in the courts

of this State is granted by this court and taken away only by this court or by statutory enactment." (*People ex rel. Andrews* v. *Hassakis,* 6 Ill.2d 463, 468.) Because of the necessity of lengthy investigations and hearings in disciplinary matters which this court could not personally conduct, we appointed the board of governors of the Illinois State Bar Association and its committee on grievances, and the board of managers of the Chicago Bar Association and its committee on grievances as commissioners of this court for the purpose of investigating practices of attorneys which tend to defeat the administration of justice or to bring the courts and legal profession into disrepute. These boards and committees serve without compensation or adequate gratitude. We set up procedures for the filing of complaints and empowered the commissioners to take proofs, and, if action by this court is recommended, to so report. We first made this general appointment and set up this procedure by order of court dated April 21, 1933. It was formally incorporated into Rule 59 at the April, 1938, term.

By Rule 59 we have not abandoned our function to the commissioners, and will take their recommendations as advisory only, and will examine all the evidence in the case. Accordingly in this case we have conscientiously examined the lengthy record and abstracts, together with the report of the commissioners. It would serve no useful purpose to set forth the vast amount of contradictory testimony in the record, but we feel compelled to set forth some of the most pertinent evidence in the record. In so doing, we will first confine ourselves to the major charges against respondent—that he conspired to permit Robert McDonald to practice law in Illinois without a license; that he testified falsely in a court proceeding; and that he engaged in improper solicitation through himself and agents.

As to the first charge, it is undenied that respondent did a great deal of work for McDonald and DeParcq; that he filed numerous suits for them in Illinois, both individu-

ally, and as co-counsel for DeParcq. There is evidence that respondent had stated that he worked with and for McDonald; that settlement negotiations in some cases filed by respondent were carried out by McDonald and settlement checks sent to McDonald. There is also evidence that McDonald was once disbarred in Minnesota and later reinstated, and that he was twice refused admission to the bar of this State. However, it further appears that, at all times material here, McDonald was a member of the Minnesota bar and DeParcq was a member of the Illinois bar. *Amicus curiae* places damaging implications on the fact that after McDonald's death respondent purchased some of his furniture and was allegedly assigned certain cases to try by McDonald's executor. We regard the purchase of McDonald's furniture by respondent as without significance. The relationship between attorney and client is personal and the right to practice expires with the death of the individual lawyer. The personal representative of a deceased lawyer is without right to assign pending cases to counsel of his choice. (Canon 35 American, Illinois, and Chicago Bar Associations.) Such choice would rest with the client, and the record in this case does not indicate its presence or absence.

We believe that the evidence fails to show a conspiracy to permit McDonald to practice law in Illinois without a license. The attacks upon McDonald's reputation, which are not conclusively supported by the evidence, cannot be attributed to respondent by association. In acting as local counsel for McDonald, as lucrative as that association might have been, respondent was not violating the ethics of his profession. We can find no showing of improper motive or illegal conspiracy in this record.

The accusation of false testimony relates to an incident in the court of common pleas of Cambria County, Pennsylvania. Suit had been instituted on behalf of one Stanford, an incompetent, against the Pennsylvania Railroad Com-

pany. Stanford's guardian filed a petition for compromise, stating that defendant had offered to settle the case for $36,000, and setting up conflicting claims for attorneys' fees between respondent, Barnhart and Ruffalo. The alleged false statements occurred in testimony by respondent on August 31, and September 3, 1948. After the charges were made that respondent had wilfully and maliciously made false statements under oath to the effect that he was not associated with Robert McDonald prior to March 18, 1947, except that in 1945 the respondent did have cases sent to him by DeParcq, who later formed a partnership with McDonald, the Hon. John H. McCann, who sat as presiding judge at the *en banc* hearing on the petition, addressed a letter to the commissioners which fully explained the proceedings on the petition and concluded with the statement that, "The charge pending before your committee * * * we feel is entirely unfounded and not substantiated by anything that transpired before this court in said hearings." This letter was dated January 3, 1951. On January 2, 1951, the attorney for the respondent filed a petition to take the deposition of the court reporter, Edgar Leahey, who was present at the proceedings. No action was taken on this petition until after the ageing Leahey had died. However, on March 9, 1951, the investigator Ericksen obtained the *ex parte* certification of the transcript of proceedings, at which time it was certified *nunc pro tunc* as of September 7, 1948. This transcript of the testimony was first rejected by the commissioners, but in November, 1952, Taussig, the attorney for the complainant, took the depositions of the other two sitting judges, Judges Griffith and McKendrick, refreshed their recollection from the rejected transcript, and obtained substantial corroboration of the transcript insofar as it showed that respondent denied a close association with McDonald.

Of considerable significance is the testimony of Arthur

L. Foster who is the assistant chief claim agent of the Pennsylvania Railroad Company in Chicago. On behalf of his employer he was interested in the court proceeding in Cambria County, Pennsylvania. Foster testified that he and the respondent traveled on the same train on their trip eastward, and enroute they discussed freely the respondent's association with McDonald as his local counsel in Chicago. It does not seem reasonable that respondent would state on one occasion to the claim agent of the Pennsylvania Railroad that he had been frequently associated with Mc-Donald and on the very next day testify under oath that he did not know McDonald and do so in a proceeding where Foster was present and in which he was vitally interested.

Assuming the risk of unduly prolonging this opinion, we find it necessary to quote from the record on several occasions. The first touches the unreliability of Leahey's transcript. Richard Finn had resigned as respondent's counsel and was being cross-examined by Taussig.

"Mr. Taussig: That is all.

Commissioner Shaw: Just a minute, Mr. Finn. Do you recall the last appearance you made here when you notified the commissioners that you were withdrawing your appearance in this case as counsel for respondent? Do you recall that occasion?

The Witness: Yes, I do.

Commissioner Shaw: You remember then stating you had a statement you wished to make and as far as you were concerned it could be either on or off the record?

The Witness: I don't recall saying whether it was on or off the record, but I recall saying that I desired making a statement that I wanted to thank the committee for their fairness and the manner of treatment of me as counsel for the defendant. Is that what you were referring to?

Commissioner Shaw: Yes.

Commissioner Shaw: Yes, That is all I have.

Mr. Vogel: Thank you.

Mr. Taussig: One moment.

The Witness: I don't care whether it goes on.

Commissioner Shaw: It isn't on the record.

Mr. Vogel: It is now part of the record.

Mr. Taussig: Q. Along the same lines as to the fairness, do you recall that you and I had discussed often the question of taking the depositions of Mr. Leahey and the various judges in Edensburg?

A. What I recall about that is this: That we came back very much encouraged by the manner in which Leahey had forthrightly admitted that this was not an accurate transcript.

Mr. Taussig: I will move that be stricken as not responsive to the question.

The Witness: I think it is responsive.

Mr. Vogel: I will adopt that statement of the witness as a statement of counsel for the respondent.

The Witness: And I recall—

Commissioner Shaw: Just a minute, read the question, please.

(The question was read.)

Commissioner Shaw: The motion is granted. Strike the statement."

When Taussig, thinking Finn was in a friendly attitude, sought further commendation, he received an adverse comment on a most important issue. Finn's statement was vulnerable to objection on the ground of it being "hearsay" and not responsive, nevertheless it had, under the circumstances, all the appearances of being the truth. Barren technicalities should not be allowed to submerge the truth in proceedings of this character.

To avoid exceeding the reasonable confines of a judicial opinion, we shall consider only typical cases submitted in

support of the solicitation charge. (*In re Mitang*, 385 Ill. 311.) In support of the charge of solicitation, prosecutor Taussig first introduced the Woodside case. The witness, Herman Woodside, a young man injured while working for the Santa Fe Railroad, testified that after he left the hospital one O. C. Brown came to see him and stated that since McDonald of Minneapolis, Minnesota, who had represented many injured railroad employees, had died, respondent was taking over, and then persuaded Woodside to go to Chicago to see respondent. There Brown had the witness examined by Dr. Turner, and then took him to respondent's office and introduced him to respondent, who, Brown stated, was a capable lawyer. Woodside further testified that respondent said the case was big and that he would like to have it, whereupon Woodside signed the usual form of contract. After having his memory refreshed by prosecutor Taussig, Woodside recalled that Brown also stated that he, Brown, was representing respondent, although Woodside did not know how that statement by Brown fitted into the conversation. At the time Woodside settled the case, contrary to respondent's advice, but at a figure substantially higher than that originally offered him, Woodside refused, at his father's suggestion, to sign the paper stating that his case had not been solicited. Woodside's mother, father and wife corroborated his testimony in regard to Brown's visits, and his mother also stated that all lawyers were crooks, and that because her son employed a lawyer he was unable to procure a job with the railroad any more.

On cross-examination Woodside admitted that his retention of respondent came about as a result of the commendation of Waller, a fellow employee injured on the same day, who was hospitalized in an adjoining bed in the Santa Fe Hospital, at Topeka, Kansas. Woodside admitted that he requested Waller to have Brown call upon him. That admission was corroborated by the testimony of Graham and

McElligott, Chicago lawyers, who investigated the Woodside and other complaints on behalf of respondent, and who took a statement from Woodside in which he admitted that his employment of respondent was due entirely to the recommendation of a fellow employee. The statement was unsigned, but was admitted by Woodside as true.

We believe at this point it would be well for us to describe the part played by those two lawyers in the preparation of respondent's defense. Both Errett Graham and John McElligott are lawyers in good standing in Chicago, the former a friend of respondent who had been associated with him in several cases. Respondent employed Graham and McElligott to interview and take statements from all former clients that were listed as witnesses against him. Graham was paid nothing but his expenses, while McElligott received a *per diem* of $50, besides expenses.

The lawyer investigators made a written memorandum of all relevant aspects of the conversations. In some instances the person being interrogated refused to sign the statement but never was there a refusal predicated upon the reason that the statement did not contain the truth. These statements were introduced in evidence and used frequently by Graham and McElligott to refresh their recollection in their testimony in this proceeding. It is significant to note that many complaints that were originally filed by Ericksen were not urged and no witnesses were called in support of them. No doubt the effective work of Graham and McElligott had some bearing on this phase of the prosecution.

We have discovered nothing in the record that would cause us to believe that both these lawyers were not completely honest in their investigation and in their testimony with reference thereto. Respondent was well aware that there were perhaps a few disappointed and disgruntled clients, who, under the influence of Ericksen, might be persuaded to deviate from the truth. To cope with such a

possibility he employed these lawyers to accompany him and interrogate such persons in his presence.

The prosecution also offered the case of Walter Wood, who testified that respondent telephoned him while the latter was in Little Rock, Arkansas, trying the Hawkins case, and that respondent solicited his case when he came out to see him at his home. Wood also stated that Brown came to see him several times, and that he finally agreed to come to Chicago and sign up. Wood's wife testified that when they were in respondent's office he showed her papers and clippings where he had obtained settlements. There was also introduced a letter sent by the Woods to O. C. Brown stating that they had recommended respondent to an injured employee, and a letter from Brown enclosing $25 for their expenses in assisting in the Maulden case.

In rebuttal, respondent offered the testimony of Webb, a fellow employee with whom Wood was acquainted, and who was being treated for injuries at the time of Wood's hospitalization. Webb testified that he and Wood visited daily while they were in the hospital, and that on a trip from St. Louis to Wood's home they discussed Wood's injury, and Wood asked Webb whether he had employed a lawyer, and Webb replied that respondent was taking care of his case. Webb also testified that Wood wrote him that he had called respondent at his hotel while he was in Little Rock trying the Hawkins case.

Webb's testimony is corroborated by the statement obtained from Wood by investigators Graham and McElligott. In that statement Wood also admitted that he noticed respondent's name in an article in a local newspaper reporting the trial of the Hawkins case, and requested respondent to see him before respondent left town, and that on January 25, 1949, Wood came to Chicago and employed respondent. Wood refused to sign the penciled statement made by the investigators, not because it did not contain the truth but

because Wood said he expected to assert other claims against the railroad.

Respondent also offered a letter written by prosecutor Taussig to Wood, after Wood had testified, from which it could be implied that Ericksen had, without authority, promised Wood that his hospital and pass privileges, which had been withdrawn by the railroad when he filed suit, would be restored if he testified against respondent. This letter stated, "I am certain you must have misunderstood him when you say he told you that you would get your rights back. Mr. Ericksen had no authority so to do." Taussig, in response to the *subpoena duces tecum* issued for Wood's letter to him, stated that it was lost. The record clearly shows that Wood was angry, vindictive and disappointed. He claimed that he was overreached in his settlement negotiations in that he was deprived of his seniority and pass rights contrary to promises made him by the railroad claim agents and his local counsel in St. Louis. He further claimed that when he signed the releases the claim agent for the railroad and respondent's local counsel Feigenbaum held the documents covered in such a way that he did not know what he was signing. A reading of the testimony on this aspect of the case convinces us that the negotiators of the release acted properly and that Wood surrendered his railroad rights reluctantly but knowingly. Only a week later he wrote a letter to respondent which completely contradicts any claim of his having been overreached or deceived. Wood undertakes to escape the effect of this letter by saying that his wife wrote the letter and that he did not dictate it or necessarily know its contents.

The prosecution also offered in support of the charge of solicitation the Deans case, involving a claim against TWA for the death of a young man killed in a TWA accident on the way back from war service. The boy's father testified that he first met respondent when the latter came to his

home and introduced himself, stating that he would like to have the case since he had the cases of the other boys killed in that accident and it would look better if they were all handled together. Deans replied that he did not like the idea of having respondent come to him, and that respondent then stated that they were reputable lawyers and would go after the railroads, airlines and big corporations. Respondent also allegedly stated that they were going to see the family of the Lyons boy, who was killed in the same accident, and showed Deans clippings from papers about different cases they won. Deans, convinced that it was all right for respondent to have the case, then signed the contract. Thereafter Deans and respondent went to the county court to procure letters of administration.

Taussig also offered the testimony of Deans's daughters, Ellen and Viola, who both testified in substance that respondent called upon them and asked if they would like to take up their brother's case. Respondent allegedly showed them checks from other cases and suggested that they talk it over with their dad. The following day Viola went to the Jefferson Hotel in St. Louis, where respondent was staying, and told him that her dad said that he did not want him to have the case. She testified that she never asked respondent or any other lawyer to come to her home.

In rebuttal, respondent introduced the testimony of William Lyons, vice-president of the Progressive Mine Workers local and representative in the Illinois General Assembly, in which he stated that he had met Deans several times at miners' conventions, and in December 1944 he had a conversation with Deans in the Odd Fellows Hall in which Deans told him about his son being killed and asked if he happened to know a lawyer in that field. Lyons, in response to Deans's request to get him a good lawyer, called respondent, who said he would go down and see Deans. Deans, however, denied any such conversation with Lyons,

and stated that he never asked anybody to recommend a lawyer to him.

In the Hawkins case, offered by the prosecution in support of the solicitation charge, it appears that Hawkins, a brakeman injured in an accident on the Missouri Pacific Railroad, testified to an alleged solicitation on behalf of respondent by O. C. Brown, and stated that his original counsel, a local attorney, agreed to the additional employment of respondent. On cross-examination, Hawkins admitted that he had talked with Swaim, the engineer on the train on which he served, about his accident. Swaim was deceased at the time of the hearings, but Mrs. Swaim testified on behalf of respondent that Hawkins telephoned Swaim in May or June 1949, and that when she told Hawkins that Swaim would return home in a day or two, Hawkins told her that he had called to have Swaim ask Brown to come by his home because he wanted to discuss his injury and claim.

Graham and McElligott testified that Hawkins admitted that he employed respondent on Swaim's recommendation. The statement of the summary of the conversation between Hawkins and Graham and McElligott was agreed to but not signed by Hawkins.

The record contains a suggestion that Hawkins was a disappointed litigant and was rather critical of respondent because he did not try his case nor handle the appeal from an adverse result. Respondent did not appear for Hawkins at the second trial because of illness, nor did he handle the appeal because, as he explained to Hawkins, the lawyer who tried the case could better do so. Hawkins had been previously injured and he had received substantial damages for such injuries. We glean from the record the thought that this factor played some part in the jury's deliberation, for on the first trial there was a disagreement and on the second there was a verdict of not guilty.

Another case that respondent enterprisingly sought and obtained is that of Ruth Bick McNichols. Francis J. Bick was an engineer employed by the Elgin, Joliet and Eastern Railroad and was killed in an accident. Bick's widow, since remarried, employed respondent after repeated calls by his representative, Howard Curtin. The commissioners in their findings completely ignored the testimony of J. R. Riley of Joliet, a life long friend of the Bick family and one who had had many dealings with respondent, socially and professionally. Riley testified that he attended the decedent's wake and there he talked with Bick's father and brother. The decedent's father inquired of Riley about legal advice for the son's family. Riley volunteered to contact Heirich and enlist his interest in the case. A careful reading of Riley's testimony both on direct and on a searching cross-examination convinces us that his testimony was worthy of belief. His testimony was contradicted by no one. He was a person of prominence whose story about the affair was impeached in no respect. Why the commissioners chose to ignore his testimony is not explained.

Harold A. Guderjan, who lived at Toluca, Illinois, testified that he was injured in September of 1945 while working for the Santa Fe Railroad; that about two weeks after the accident, respondent called on him at St. Mary's hospital at Galesburg, Illinois, and said that he was representing McDonald, DeParcq and Davis, attorneys for the Brotherhood of Railroad Trainmen; that respondent gave him his card, showed him a bunch of letters, clippings and photostatic copies of settlements, and said that they would like to handle his case; that Guderjan told respondent he was not interested in securing an attorney and that respondent stated he would call again; that about two weeks later respondent called on Guderjan at the hospital while Mrs. Guderjan was present; that on this occasion respondent talked further concerning the case and left a contract for Guderjan to sign and that the attorneys named in said

contract were McDonald, DeParcq and Davis; that Guderjan was not acquainted with respondent, McDonald, DeParcq or Davis, and did not request any of them to call upon him and did not request any member of the brotherhood to have any legal representative of the brotherhood call upon him.

Walter Dew testified that at present he is a garage and service station owner, that during the time in question he was a brakeman on the Santa Fe, secretary and treasurer of the Brotherhood of Railroad Trainmen, and as such it was his duty to notify the general office at Cleveland of any injured member of the lodge. He testified that he contacted McDonald and DeParcq of Minneapolis, who in turn notified respondent to call on Guderjan. Heirich called Dew and agreed to meet him at a hotel in Galesburg and asked Dew to accompany him to the hospital to meet Guderjan. Respondent's train was one and one-half hours late, and Dew was compelled to leave for work before his arrival, so respondent went to the hospital alone. In evidence is a letter from the Brotherhood of Railroad Trainmen acknowledging receipt of Dew's report of Guderjan's injury and containing a reference to the availability of the legal aid department of the brotherhood.

In the case of Vincent Melargno, the commissioners found, "The record shows by clear and convincing proof that respondent solicited the Vincent Melargno case directly and personally in Chicago." A careful reading of the record discloses that there is no evidence to support the charge.

In the other solicitation cases presented, but not referred to in this opinion, there was testimony relating to aggressive conduct in the procurement of the cases by respondent or his investigator, O. C. Brown, and rebuttal evidence of admissions by the witnesses that they heard of respondent through friends or acquaintances and themselves requested his participation, or statements of friends and

acquaintances of the witnesses that they had recommended respondent after being asked if they knew of a good lawyer.

The prosecution offered no evidence of fraud or over-reaching of respondent's clients. The only suggestion of such conduct was in the Felter case, where there had been a tacit agreement that respondent would charge no fee on the first $5000 received by Felter from the railroad, but after Felter settled directly with the railroad himself for the sum of $5250, a sum considerably less than that demanded by respondent in his negotiations, a fee of $1000 was then authorized to respondent. Felter admitted on cross-examination that he was "mad" at respondent "$1000 worth."

At the commencement of these proceedings there were many charges made impugning respondent's integrity. All such counts were dismissed with the exception of No. 1 which accuses respondent of perjury in connection with the hearing in the court of common pleas of Cambria County, Pennsylvania.

In addition to the foregoing evidence, 42 judges and lawyers appeared as character witnesses and either testified or had their testimony made the subject matter of stipulations on respondent's behalf to the effect that they had known respondent for a considerable number of years; that they knew the people with whom he worked; that his reputation for the honorable and ethical practice of law is good; that his reputation for honesty and integrity is good; and that respondent has a good reputation for honesty and integrity in the community. In the interest of brevity we shall not list the names of all these witnesses. It is uncontroverted that many of the judges have been deemed "well qualified" and "very well qualified" for their offices in bar association evaluations and overwhelmingly approved in bar polls. The list of attorneys includes past bar association presidents and other officers, as well as esteemed members of the profession.

The evidence also reveals that Carney, head of the Rail-

road Claims Reference Bureau, in response to the question "In any of your dealings with the respondent Bruneau Heirich has he ever dealt with you otherwise than as an honorable and ethical practitioner?", said "I would say to this question he has never dealt other than as a gentleman, ethical and moral."

Carney's evaluation of respondent's reputation was shared by the other railroad claims men. The witness Thomas W. Smiley, general adjuster for the Burlington Railroad, who knew respondent for some seven years, in response to the question of whether or not in his dealings with respondent he ever found him to be other than an ethical practitioner and lawyer, stated "No, I never found him otherwise. He was always equitable with me."

The witness E. M. Muldoon, claims attorney for the North Shore & Milwaukee Railway Company, and past president of the Association of Railway Claims Agents, replied to the question, "In your dealings with Mr. Heirich, did you ever find him other than an ethical practitioner as a lawyer?" by stating "Well, my relations with him have always been satisfactory. I have not known of any unethical practice of any kind so far as our cases were concerned."

The witness Walter Ross, partner of the law firm of Eckert, Peterson & Lowry, attorneys for American Airlines and Transcontinental & Western Airlines, who knew respondent for seven years, stated: "I would say that in my dealings with Mr. Bruneau Heirich I have always found him to be honorable."

Moreover, commissioner Hurd stated that "we are assuming that respondent handled the case as he received it in perfectly proper fashion and in no way failed to get the maximum out of it."

The record here clearly shows that the charges were prepared by George Ericksen and the prosecution conducted by attorney Taussig, both employees of the Railroad

Claims Research Bureau. This group was organized in 1946 by the general solicitors of four or five railroads. It was later expanded to include at least 21 railroads. It handled funds and retained an investigator and attorney to probe facts surrounding solicitations and present evidence to bar associations. The investigator worked on a budget of about $20,000 a year. George Ericksen was employed by the bureau in 1949, and was instructed to report for work to the committee on personal injury practice of the Chicago bar. The bureau met with the president of the bar and its general counsel, *amicus curiae* here, in 1949. An offer was made to give the bar association money to prosecute "ambulance chasers." This offer was refused, but the alternative proposal that the bureau employ Ericksen and Taussig to work with the committee, was adopted.

There is substantial evidence in the record, undenied by investigator Ericksen, that he resorted to ruse and artifice in approaching former clients of respondent. There is direct evidence that Ericksen attempted to entrap respondent by representing himself as a relative of a person killed in an accident. There is ample uncontradicted evidence in the record to convince this court that Ericksen, acting with credentials of the Chicago Bar Association, was more interested in disbarring respondent than in determining the facts. Ericksen also introduced himself to other clients of respondent as from the United States Claims Department, and from the Attorney General's office. Ericksen also contacted many current clients of respondent, expressing great solicitude for them, explaining that respondent's services were of questionable value because "he would soon be disbarred."

Reference has already been made to Ericksen's unauthorized promise of reward to the witness Wood for testifying, such being implied from the letter written by Taussig to Wood. The record also shows that Ericksen drove

Woodside out to view respondent's palatial suburban home immediately upon Woodside's arrival in Chicago to testify, which respondent claims was designed to inflame whatever animosity the witness bore respondent.

We further take judicial notice of respondent's exhibit 48, rejected by the commissioners, being a report of the Railroad Retirement Board to the senate committee on Interstate Commerce, which we believe bears directly on this proceeding. That report shows a general course of conduct and a highly antagonistic attitude of the railroads toward all employees who retain counsel to defend their rights; that in Federal employers' liability cases settled without counsel, 97% of the employees returned to work for the railroad; while if suit was filed, from 80% to 96% of such employees lost their jobs. In that connection the witness Woodside admitted, and his mother reiterated, that because he retained respondent "they wouldn't let him railroad any more," and he further stated that Ericksen told him when he first came down to see him that the railroads were out to get Heirich, and that he, Ericksen, was down there for the bar association to disbar respondent. This was undenied although Ericksen was constantly present at all the hearings. The report states in part: "In some cases indeed, the claim agents go much further with implied threats that if suit is filed, the claimant would never be able to work for any big company again, or would receive references so unfavorable as to amount to blacklisting." The report further states: "The experience for all cases in which bargaining could be measured in these terms is summarized in table 5. In nonattorney cases bargaining resulted in a settlement which was on the average of 60% to 78% higher than the initial offer. Where an attorney was engaged, the initial bid was on the average more than doubled before the case was closed. In cases where the attorney felt it advisable and persuaded his client to file suit, the gross

amount recovered was on the average of three or more times larger than the figures originally named by the claim agent."

The testimony of the director of the Railroad Claims Research Bureau indicates that at least one of the railroads adopted the practice of settling with claimants even when they knew that a lawyer was representing the claimant at the time.

We are compelled to the conclusion that this proceeding was more than an impartial investigation of unethical practices by a bar association with the sole desire to protect the public and the profession. The record indicates that it was an adversary proceeding between the railroads and one of their antagonists. The time and energy of the railroads devoted to this proceeding might well have been spent in perfecting a code of ethics for railroad claim adjusters and in requiring its observance, for the improper activities of claim adjusters develop the climate in which solicitation of the type complained of in this proceeding may thrive.

Respondent also refers to portions of the record where prosecutor Taussig was allowed over objection to coach the witnesses Woodside, Wood and Hawkins by referring to previous conversations and admissions allegedly made by the witnesses in Taussig's office. Respondent cites the following excerpt to show how Taussig was permitted, if not assisted by the recess called by the commissioner, to elicit the statement from Woodside that Brown announced, "I am representing Mr. Heirich."

"Taussig: Do you recall this afternoon or this morning you told me what had taken place when you were first introduced?

Finn: (Respondent's counsel at the time): Just a minute. I will object to the form of that question and I think to the substance of it also. I think this is an attempt—

Taussig: Refresh the witness's recollection.

Finn: No, it is more than that. In effect it is an impeaching of his own statement.

Commissioner: Objection overruled.

Taussig: Did you have anything more to say, did he say anything more, did Mr. Heirich or Mr. Brown have anything to say?

Witness: Yes, Mr. Heirich told me he had a report from Dr. Turner that my arm was pretty serious.

Commissioners called a recess, after which Taussig resumed this line of inquiry with the witness:

Taussig: Was anything ever said or done at the time on March 20, 1948?

Witness: You mean while we were signing?

Taussig: Yes, before or after or while you signed.

Witness: Yes, sir.

Taussig: What was it?

Witness: Mr. Brown said he was representing Mr. Heirich.

Taussig: When was that said?

Witness: Right at first when he first came inside the door."

On cross-examination the witness admitted that he did not know why the remark was made or how it fitted into the conversation. And then consider the foregoing in connection with the testimony of Dorothy Woodside, Herman's mother, wherein she stated that she was present in Taussig's office when Taussig first asked Herman what was said when Brown opened up Heirich's door. On cross-examination this appears:

"Q. And Mr. Taussig explained to Herman, did he not—

Mr. Taussig: (Interrupting) I am wondering if that is the proper form of cross-examination. If counsel is testifying or if the witness is testifying.

Commissioner Hurd: I think this is all right.

Mr. Finn: Q. Mr. Taussig explained to Herman at that time that it was necessary that he testify to a conversation, to that conversation about Mr. Brown, saying, 'I am

representing Mr. Heirich,' because it was necessary to establish agency, or that Mr. Brown was working for Mr. Heirich, isn't that true?

A. Yes."

On cross-examintion Herman Woodside testified to the following:

"It is correct that I found out Brown made the investigation in the Waller case. It is correct that Waller suggested that I let him investigate my case. It is correct that I thought it was a good idea. I don't know whether I told Waller to have Mr. Brown call on me. That is I don't know whether I told that to McElligott and Graham. It was a fact that I told Waller to have Brown call on me the next time he saw or heard from him. That is true.

Q. So you asked Mr. Waller to have Mr. Brown call on you to discuss your case the next time he came to see Mr. Waller. That is correct isn't it?

A. Yes sir, I believe it is."

The conclusion is inescapable that Woodside was not an honest witness. He admitted that he was mad because O. C. Brown quit calling on him after his case was settled. He further admitted that he was disappointed in his settlement which he insisted upon accepting notwithstanding his action was contrary to the advice of his father and the respondent. Such a disgruntled person is a ready victim for subornation. To that end Woodside was available for exploitation. The testimony of Woodside on O. C. Brown's agency was unquestionably the product of Ericksen's coaching. At this juncture, we can profitably advert to three cases, *In re Rerat,* 332 Minn. 1 ; *State ex rel. Florida Bar Association* v. *Murrell,* 74 So.2d 221 ; *State ex rel Turner* v. *Denman,* 259 S.W.2d 891, wherein it was held that evidence adduced by an investigator paid by a corporation whose interests are in conflict with respondent's and whose objective is to build a case against respondent is of limited value.

In *State ex rel. Turner* v. *Denman,* 259 S.W.2d. 891,

where the court approved the chancellor's ruling acquitting Denman, who had been charged with solicitation, the court commented on that mode of procuring evidence: "These investigators were not impartial in their work. Their interests and sympathies were on the side of defendants in damage suits where insurance was involved; and there their treasure lay. It is easy for this court to see how such investigators could find disgruntled clients of any lawyer and fanning the flame could secure adverse statements. Very seldom does any claimant in a damage suit recover by trial or settlement an amount which will fully satisfy him. In such case a specialist in that field can convince the client that his lawyer has been unethical in his conduct, and has not properly represented his client." With reference to the credibility of such evidence the court stated: "We think it very doubtful, however, whether a bar association could rely with a proper degree of accuracy upon statements secured by investigators or detectives who were in the employ of a certain corporation or class of corporations whose interests were directly in conflict with the interests of the clients represented by the lawyers under investigation. Such investigations should be made impartially and with a view of ascertaining the truth and not with the view of building up a case against defendants."

The court in the *Murrell case* also considered as limited the credibility of any evidence procured by investigators paid by companies out to disbar an attorney, as in the instant case, and approved the referee's condemnation therein of the practice of permitting insurance companies to investigate the conduct of attorneys under charge of unprofessional conduct, noting that such practice was condemned in *Schoolfield* v. *Bean*, 167 S.W.2d 359, and *State ex rel. Turner* v. *Denman*, 259 S.W.2d 891. The court stated further: "It is perfectly evident that these companies were out to make a case against respondent and should not have been permitted such a prominent part in directing trial." Wood-

side's testimony that Ericksen told him that the railroads were "out to get Heirich" was uncontradicted.

Respondent contends that, regardless of any question of his guilt or innocence, the proceedings before the commissioners were wholly vitiated because one of the commissioners was a partner in a law firm that represented several members of the Association of American Railroads, which association financed the costly proceedings that are now before us. We agree that respondent was entitled to be tried before a tribunal that was completely disinterested in the subject matter and that it would have been appropriate for the commissioner to have disqualified himself.

In so doing, we need not in law, nor do we in fact, hold or intimate that this particular commissioner was infected, consciously or unconsciously, with prejudice or affected by other motivation against respondent.

It is a classical principle of jurisprudence that no man who has a personal interest in the subject matter of decision in a case may sit in judgment on that case.

The principle is as applicable to administrative agents, commissioners, referees, masters in chancery, or other arbiters of questions of law or fact not holding judicial office as it is to those who are technically judges in the full sense of the word. We have recently so held in *Smith* v. *Dept. of Registration and Education,* 412 Ill. 332. In that case a physician's license had been rescinded by a board comprised of physicians who, according to the physician's uncontradicted sworn statements, were hostile to him and to his ideology of medical practice. We said, at page 343: "Charges of prejudice on the part of the committee went undenied and were refuted only to the extent that the attorney for the Department assured appellant that it was his opinion that the committee would be entirely fair. We are of the opinion that the Department was in error in not selecting a different committee to hear the instant case."

In so holding, we followed the case of *Alabama ex rel. Miller* v. *Aldridge,* 212 Ala. 660, 103 So. 835, 39 A.L.R. 1407. In that case the Supreme Court of Alabama annulled the revocation of a license of a certified public accountant because members of the administrative board concurring in the revocation had interests antagonistic to that of the accountant. In that case the Alabama Society of Certified Public Accountants, of which society members of the administrative board were members, had contributed money to the prosecution of the charges against the accountant. In this case the Association of American Railroads, of which association clients of the commissioner's firm were members, had similarly contributed funds to the prosecution of these proceedings against respondent.

We need not cite authority holding that if a venireman were to be retained upon a jury in a case in which he or the company that employed him had a financial interest over appropriate challenge, the verdict would be set aside. A similar principle is applicable here.

For the guidance of this court's commissioners in future cases and of all other persons required to find facts or apply law in adversary proceedings, judicial or administrative, we hold that when such an arbiter has a financial interest in the subject matter, even though he personally be a man of the most fastidious probity, it is his duty to recuse himself. He must do so if challenged.

The record shows that one of the commissioners who was asked to recuse himself refused to do so, notwithstanding the fact that his law firm represented several railroads who were members of the association that financed and directed the prosecution of these proceedings.

Respondent, in support of his claim of partiality, further notes that the record shows that the findings of the commissioners made no reference and gave no effect to the testimony of the character witnesses and disregarded all evi-

dence favoring respondent without any comments on its credibility.

In the Bick case Riley testified that the father and brother of Bick authorized him to contact respondent and have him call on the widow. If this testimony is credible, then Heirich's investigator commenced negotiations at the request of the Bick family, which of course, removes the case from the category of "ambulance chasing." We have searched the record to find if either of the Bicks testified either in support or contradiction of Riley's testimony. We find that neither appeared. In view of Ericksen's enterprise and zeal and the fact that the Bicks were friendly with the prosecution, we feel that it is appropriate to apply the rule that there is a presumption against the party failing to produce contradictory testimony. On behalf of respondent many disinterested witnesses testified that his employment was the result of his having been recommended by friends and former clients. The Woodside, Wood, Bick and Hawkins cases heretofore considered are typical. On every count there was such proof. In several of the cases where former clients testified in support of charges of solicitation, they were impeached by the testimony of Graham and McElligott.

The purpose of a disciplinary proceeding is not for the punishment of the attorney, but for the protection of the public and maintenance of the integrity of the profession and of the court. (*In re Donaghy,* 402 Ill. 120; *People ex rel. Chicago Bar Association* v. *Lotterman,* 353 Ill. 399.) This duty of the court to protect the public from improper practices must not be exercised in a despotic or arbitrary manner but with legal discretion, and the charges must be sustained by clear and convincing proof and must not be the product of improper motives. *In re Donaghy,* 402 Ill. 120; *In re Lasecki,* 358 Ill. 69.

The canons of ethics of the State and American Bar

Associations are not binding obligations and are not enforced by the courts as such; however, they constitute a safe guide for professional conduct and an attorney may be disciplined for not observing them. *In re Mitgang*, 385 Ill. 311, 324.

It is evident that some infractions of the canons of ethics are more serious than others, and while the offense of solicitation of business is not one which imports venality, criminality, fraudulent practices or moral turpitude, its practice is inimical to the good reputation of the bar. (*In re Veach*, 1 Ill.2d 264). Courts, however, have refrained from defining what constitutes such solicitation and have frequently stressed the motive of the solicitation in determining its propriety. *People ex rel. Chicago Bar Ass'n*, 313 Ill. 601.

It has been held that the employment of an investigator is not unethical and that it cannot be inferred from such employment that the attorney is engaged in "ambulance chasing." (*In re Donaghy*, 402 Ill. 120; *In re Mitgang*, 385 Ill. 311.) In the *Donaghy case* the court stated at page 129: "Personal injury lawyers, representing plaintiffs for the most part, must compete against the investigatory staffs of the large corporations and insurance companies and must necessarily hire investigators for their own success."

Moreover, it has been held that the friends, acquaintances and associates of the attorney have the unquestioned right to sound his praises and to divert to him such clients as they can persuade in a legitimate way to engage his services. (*In re Mitgang*, at p. 328.) Inasmuch as courts are not expected to be ignorant of those things which other men through their associations well know (*In re Holland*, 377 Ill. 346), we know that each attorney depends upon friends and those who have engaged his legal services and upon any other number of circumstances showing his ability to handle law business. *In re Mitgang*, at p. 329.

In the *Donaghy case*, where a hospital had recommended the respondent in a number of cases, the court held that the relation between the hospital and Donaghy bordered on the line between propriety and impropriety, but since there was no evidence to establish any "arrangement" to which the respondent could be said to have been a party the charges were dismissed. In other words, in the *Donaghy case* some importance was attached to the fact that there was no proof that respondent had paid alleged chasers any sum of money. In the instant case there is no such proof. In addition, the record shows that the prosecution had respondent's bank records, or photostatic copies of his deposits and withdrawals, over a several year period. Heirich obtained many large verdicts and settlements. If he paid substantial sums to alleged chasers, no doubt some suggestion of this would be reflected in his bank records. Respondent was present at all hearings and could have been asked about various withdrawals if any were suggestive of evil practices.

In the *Mitgang case*, where the attorney was merely censured, he had permitted investigators to carry about and accept in his name contracts of employment which would result in fees to the investigators paid from the recovery in the personal injury action. No such evidence was adduced herein.

The prosecution's reply to respondent's defense is anchored in the oft-reiterated statement that respondent did not take the stand to deny the charges. Respondent's counsel assumes in the briefs and in the oral argument before us full responsibility for his client's failure to testify. He argues that the four-year trial had already taken a heavy toll and that further proceedings before a tribunal that was less than fair would result in more persecution, increased expense, loss of business, etc., with little to be accomplished thereby.

In our opinion, however respondent's defense would be strengthened by his testimony. Such failure cannot be

deemed as conclusive. We cannot approve the reasoning in the commissioners' report to the effect that the witnesses Graham and McElligott could not be believed because respondent failed to testify that they were telling the truth. Graham and McElligott testified that Woodside told them that he sought respondent rather than that respondent had solicited his case. Woodside testified on cross-examination that that is just what he told Graham and McElligott. Yet the commissioners report that the two lawyers are unworthy of belief because respondent did not take the stand in support of them.

In addition to the rebuttal testimony adduced by respondent, we should not overlook the impressive array of judges and distinguished lawyers, and even railroad claims men who were his adversaries in this disbarment proceeding, who all testified unequivocally to respondent's ethical and moral practice of his profession on the basis of association with respondent over a period of years.

Although it is true that the ordinary judge or lawyer will not go out of his way to say anything derogatory about a fellow practitioner, it is true that neither judges nor lawyers will discommode themselves in large numbers to aid a practitioner following disciplinary difficulties unless the subject is worthy of such aid.

While we are cognizant of the decisions holding that evidence of good reputation will not overcome evidence establishing specific charges, particularly if the offense involves moral turpitude (*In re Harris,* 383 Ill. 336), nevertheless, where the evidence is conflicting and the charge does not import criminality or moral turpitude the court should give weight to such testimony of good reputation.

In the *Mitgang case,* also involving the charge of solicitation, the court, after noting the absence of evidence of fraud or overreaching of clients, stated at page 333: "Respondent has offered evidence of his good reputation for

truth and professional standing among his associates and the judges before whom he practiced, which has weight where motive is an element of the offense charged."

The complainants in this cause have analogized the case at bar to *In re Veach*, 1 Ill.2d 264, where the respondent was suspended for solicitation. A review of that record reveals that the clients of the respondent therein were the aggrieved parties. According to the evidence, Veach had no trial experience and maintained no office, would neither try cases nor employ able counsel to assist him. He was a notorious chaser obtaining contracts from the injured while in the hospital while still under the influence of pain relieving drugs. He would betray his clients by persuading them to accept quick settlements, far below the sum to which the clients would normally be entitled. No one testified in his behalf on the trial.

The mere statement of the facts reveals the dissimilarity of the cases and the inappropriateness of any analogy. In contrast to the *Veach case* the proceedings herein were not instituted at the behest or instigation of any former client. On the contrary, respondent's former clients and his adversaries, and even the commissioners, agreed that he handled his cases in an ethical and able manner, and at no time ever betrayed his clients or did anything inimical to their best interests. His reputation as an able and successful trial lawyer was good. Furthermore, respondent herein offered independent witnesses to refute the charges. His failure to testify in his own behalf cannot convert his conscientious conduct on behalf of his clients to the repugnant, double-dealing actions of Veach, as complainant herein suggests. Therefore, the decision in the *Veach case* can in no way be deemed determinative.

It is the duty of this court to condemn unethical and unprofessional practices when they are brought to our attention in the manner prescribed by Rule 59. Yet this court has repeatedly said that inasmuch as the disbarment of an

attorney is the destruction of his professional life, his reputation and his livelihood, the court should proceed with caution and moderation, and the record must be free from doubt not only as to the act charged, but also to the motive with which it is done. (*In re Mitgang,* 385 Ill. 311; 7 C.J.S. 729.) "Ambulance chasing" is certainly a practice that deserves severe condemnation, especially where the offenders are dishonest and engage in fraudulent and overreaching practices. Any investigation that is designed to improve the standing of the legal profession should be encouraged, but such an investigation ought to be by disinterested commissioners of this court and should proceed without financial, or other, support from any interested party. As stated by Justice Cardozo in *People* v. *Culkin,* 248 N.Y. 465, 162 N.E. 487, at page 493: "If the house is to be cleaned, it is for those who occupy and govern it rather than some stranger to do the noisome work."

There seems to be no question but what a group of railroads commenced this prosecution and that they hired George Ericksen to prepare the complaint and secure the evidence. This he proceeded to do without a conscience. We are sure that we are not doing violence to this record when we say that Ericksen, in constructing the case against respondent, was guilty of subornation, bribery, deceit, trickery, entrapment and false impersonation. In the Woodside case there was every indication that he was guilty of subornation; in the Wood case there was an appearance of bribery and subornation; in the Bailey case there was entrapment and deceit; and in several instances he posed as a representative from the office of the Attorney General of the State of Illinois. A fair example of the prosecution's building process is contained in the Pennsylvania case. Ericksen procured the authentication of a transcript prepared by an old man admittedly incompetent, and one who acknowledged that his work was not accurate. The absurdity of this charge lies principally in the fact that respondent testified

under oath that he did not know Robert McDonald when on the day previous he had told his adversary in the same proceeding that he had represented McDonald many times in Chicago as his local counsel. On oral argument the court asked Mr. Leviton, counsel for the bar association, to explain this improbability. His answer was "I do not believe that I knew that that was in the record." And to this same counsel's credit it may be added that when asked by another member of the court if he approved of Ericksen's tactics, he offered no excuse or defense.

It may be observed further that when these proceedings were initiated, there were many charges involving moral turpitude, but all such counts, finding no support in the evidence, were dismissed with the exception of the claim of perjury. In our case law relating to disciplinary action, we find that charges of solicitation are usually accompanied by proof of some specie of dishonesty, particularly where punishment is prescribed. Ericksen failed to produce any proof that reflected adversely on respondent's integrity. Hence, the desperation implicit in the prosecution's reliance upon the Pennsylvania charge.

More light on the character of Ericksen is found in the fact that he finds it relevant to his duties as investigator to visit respondent's current clients and gratuitously advise them that it would be well for them to seek other counsel— "for Heirich will soon be disbarred." On a record constructed almost in its entirety by such an investigator, we are asked to punish a lawyer who bears a fine reputation for ethical and honorable conduct—overwhelmingly established by testimony of more than forty of the ablest members of the bench and bar of Chicago.

The respondent has pursued the personal injury business successfully and aggressively. We would be naive to say that his enterprise has not occasionally carried him into an area where his activity is subject to criticism. Notwithstanding the peril of a continuation of Ericksen's damaging

operations, we think that respondent's failure to take the stand and testify justifies our censure. But this record does not contain the believable, reliable, clear and convincing evidence that is required in proceedings of this character. The report of the commissioners should be overruled and respondent discharged. *Respondent discharged.*

Mr. JUSTICE DAVIS, dissenting:

I concur with the majority finding that the record fails to establish that respondent conspired with McDonald and others to enable McDonald to practice law in Illinois without a license, and that respondent made false statements under oath in the case of *Stanford* v. *Pennsylvania Railroad Co.* in the court of common pleas of Cambria County, Pennsylvania; but I dissent from the majority finding that the record "does not contain the believable, reliable, clear and convincing evidence that is required in proceedings of this character" to warrant disciplinary action by this court, and from its judgment discharging the respondent without reproach save censure for failing to take the stand and testify in this proceeding.

This dissent relates to the findings and conclusion of the majority in connection with the charge of solicitation or "ambulance chasing." These charges deal with several different cases concerning which varying amounts of evidence were offered. I shall not attempt a detailed analysis of all the conflicting evidence regarding each transaction, but shall briefly refer to the instances which I deem most important in the voluminous record.

### WALTER H. WOOD

Walter H. Wood was injured in August, 1948, while working for the Missouri Pacific Railroad. He testified that respondent called him by telephone and asked him if he was the Walter H. Wood who worked for the Missouri Pacific Railroad and who had a back injury, and upon

being answered affirmatively, respondent then came to his home in North Little Rock, Arkansas, in November, 1948. At this time respondent asked if O. C. Brown, his man, had contacted Wood and being advised that such contact had been made, respondent requested the case, told Wood of his big verdicts, and that this case was worth $50,000 in Chicago. Wood testified that O. C. Brown later came to his house, praised respondent highly, and urged· him to come to Chicago to see the respondent. At that time Brown left his card and told Wood to give him the names and addresses of any injured railroad men and he would see that Wood received a nice little check for such service. Wood also testified that respondent made the same proposal to him. Brown again made a trip to the Wood home in January, 1949, and continued to urge him to come to Chicago. On these calls Brown would discuss with Wood other cases he was trying to get and told him of large verdicts the respondent had obtained. In February, 1949, Wood wrote to Brown giving him the name of Teeth Mauldin who had been injured. In June, 1950, Wood received a $25 check from Brown together with a letter signed "O.C." stating in part that, "I wish he had gotten $100,000. Then we would have made some money." Wood further testified that Ludwig Cramer called at his home; introduced himself; said he worked for respondent; inquired concerning certain area Missouri Pacific Railroad employees who had been injured; and called them from the Wood home by telephone to make an appointment. Subsequently, Wood went to Chicago where he and Brown met by prior agreement; thereafter, Wood signed a contract with respondent. The case was later settled by attorney Feigenbaum, who acted as local counsel for respondent in St. Louis, Missouri. Wood's wife corroborated her husband in all material respects. The solicitation of Mauldin by the Woods is also corroborated by the testimony of Teeth Mauldin and his wife. The Woods were the in-

formants and O. C. Brown was the contact man in procuring this case.

To rebut this testimony, respondent introduced an affidavit executed by Wood at the time that he signed other settlement papers in attorney Feigenbaum's office, which recited that the Wood case had not been solicited. Attorney Feigenbaum testified, but made no specific reference to the circumstances surrounding the execution of this affidavit, and attorney Feigenbaum's son, Robert Feigenbaum, who took the acknowledgment on said instrument, was not called as a witness. However, Wood testified that he just signed several papers for the attorneys' records; did not read them; that he was rushed into signing them; that he did not swear to anything at that time; did not meet a Robert Feigenbaum and did not know a Robert Feigenbaum. The circumstances surrounding the signing of this affidavit naturally detract from its probative force. *In re McCallum,* 391 Ill. 400.

Willie Webb, an employee of the Missouri Pacific Railroad, who was likewise hospitalized while Wood was receiving treatment for his injuries, was a witness for respondent. Webb testified that he and Wood visited daily while they were in the hospital; that while on the train from St. Louis to Little Rock they discussed Wood's injury and that Webb then told Wood that respondent was acting as his attorney. Webb also testified that Wood wrote to him stating that the respondent had tried the Hawkins case at Little Rock, and that Wood had called respondent at his hotel. Mrs. Wood was called as a rebuttal witness and denied the substance of much of Webb's testimony.

Webb's testimony was corroborated by a statement obtained from Wood by respondent's witnesses, attorneys Graham and McElligott, who testified that Wood stated that he met Willie Webb, an injured fellow-employee while they were hospitalized; that Webb told him that respondent was his attorney; that he took from Webb respondent's

name and address; that when he returned to his home in North Little Rock the paper there reported that respondent was trying the Hawkins case; and that he (Wood) called respondent at his hotel and asked respondent to get in touch with him before leaving Little Rock. These attorneys further testified that Wood refused to sign this written statement because he feared it might jeopardize some further claims he had against the railroad.

Respondent also offered a letter written to Wood by Taussig, after Wood had first testified. From this letter it could be implied that Ericksen had, without authority, promised Wood that his hospital and pass privileges, which had been withdrawn by the railroad when he filed suit, would be restored if he testified against respondent. It stated, "I am certain you must have misunderstood him when you say he told you that you would get your rights back. Mr. Ericksen had no authority so to do." Taussig, in response to the subpoena *duces tecum* issued for Wood's letter to him, stated that it was lost and such letter was never produced.

## FRANCIS J. BICK

Francis J. Bick, an employee of the E. J. & E. Railroad, died in an accident in November, 1947. His widow, who resided at Joliet, Illinois, testified that shortly after the death of her husband, Howard Curtin called at her home and said that he had found out about the case by reports from Washington; that he said respondent represented Dana Mayhew of Joliet; that he called Mrs. Mayhew by telephone and requested Mrs. Bick to talk with her; and that in this conversation, Mrs. Mayhew said they were pleased with the respondent's services. She further testified that Curtin said the respondent represented Clark Gable when Gable sued for the death of Carole Lombard and that respondent got him $75,000; that she should expect from $27,000 to $65,000 in this case; and that Curtin

opened up a portfolio and showed her photostatic copies of large checks, settlements, etc. She was corroborated by a sister-in-law and brother. She further testified that she went to respondent's office with Curtin, who introduced her to respondent by saying, "Mr. Heirich, you told me not to come in without the Bick case, and here it is."

Respondent called J. R. Riley, a former client and sales manager for National Cartage Co. of Joliet, who testified that he attended the wake and funeral for the decedent; that he was a friend of the Bick family; that he talked with them and that at the request of the father of the deceased, he called respondent and asked him to see the relatives of the decedent. No rebuttal testimony was offered to refute this statement. However, it is significant that Curtin never referred to Riley as his contact in this case, but rather, cited the Washington reports as the source of his knowledge concerning this fatal injury.

The majority notes that no rebuttal testimony was offered to refute the testimony of J. R. Riley and has applied the rule that under such circumstances a presumption arises against the party failing to produce contradictory testimony. Such rule is applicable here to the same extent as under a like factual situation hereinafter mentioned.

The undenied testimony of Mrs. Bick is that after she had obtained an offer of settlement from the railroad in the sum of $20,000, Curtin offered to give her a written guarantee of $25,000 in connection with the case and later did present her with a letter signed by respondent, whereby respondent agreed that out of the money recovered from the railroad, Mrs. Bick would receive not less than $25,000 net to herself as administratix before attorney fees would be deducted and that she would receive three fourths of the total recovery. (Complainant's exhibit 49.) In the interim, Mrs. Bick had been offered $30,000 by the railroad and she so told Curtin who crossed out the $25,000 figure and wrote in $30,000 and wrote alongside this figure, "O.K.

Howard J. Curtin." This guarantee letter was dated March 19, 1949, and the retainer contract was dated and signed March 24, 1949.

## EUGENE H. FELTER

Eugene Felter, who lived at Norwalk, Ohio, was injured while employed by the Nickel Plate Railroad in 1947 and was taken to a hospital in Cleveland. After he returned to his parents' home, Oliver Zollicoffer called upon him. Felter testified that Zollicoffer showed him photostatic copies of checks, paper clippings,etc., pertaining to cases which respondent had and was handling; that Zollicoffer said he thought Felter's case was worth about $30,000; that respondent would give him a guarantee and make monthly advances until the case was settled; that Zollicoffer called again December 7, 1947; that he urged Felter to go to Chicago with him to see respondent and be examined by respondent's doctors; that Felter went to Chicago with Zollicoffer; that Zollicoffer took Felter to respondent's office and from there to Dr. Turner's office for examination; that thereupon they returned to respondent's office; that respondent talked with Dr. Turner by telephone and then told Felter that his case was worth from $30,000 to $35,000. Respondent wrote and signed a letter addressed to Eugene H. Felter dated December 8, 1947, providing for a one-third net retainer and a guaranteed net of $5000. On this occasion respondent also executed and delivered to Felter a $50 check as a monthly advance and Felter signed a retainer contract with respondent. Felter testified that respondent also told him that if he could get any cases for respondent that he, (Felter) would get the same percentage as respondent's men.

To refute this testimony, respondent produced Michael James Gilmore of Youngstown, Ohio, who testified that he met Heirich in the summer of 1946 at Youngstown; that while en route to Chicago, Gilmore stopped at a

gas station at Norwalk, Ohio, and met a man named Felter who was manager of the local Elks Club; that Felter told Gilmore how he had built up the Elks Club with slot machines; that he had a son who got hurt while working on the railroad; that the railroad did not seem to want to settle; that Felter asked Gilmore if he knew a good lawyer for that kind of a case; that Gilmore told him that he had been introduced to a lawyer from Chicago who got terrific verdicts from railroads and that his first name was Bruneau but that he had forgotten the last name; that Gilmore told Felter that he did not know for sure whether he could locate this man, but he would try to find him; that when Gilmore arrived in Chicago, he searched through the classified section of the telephone directory and the only lawyer with the first name of Bruneau he could find was the respondent, whom he called at his office and found to be his former acquaintance; that he thereupon went to Heirich's office and told him to get in touch with Felter at Norwalk, Ohio; that only the respondent was in the office at that time; that Gilmore never saw Felter again and never saw respondent again until requested to testify in this proceeding.

The somewhat unusual testimony of the ubiquitous Gilmore, as well as the alleged meeting, was denied by the senior Felter.

### HAROLD A. GUDERJAN

The facts pertaining to the injury of Harold A. Guderjan and to the visits of the respondent, at the hospital, to see him and secure his signature to a contract to retain the services of McDonald, De Parcq and Davis, as attorneys, are set forth in the majority opinion and are incorporated by reference.

Walter Dew, presently a garage and service station owner, testified for respondent stating that during the time in question he was a brakeman on the Santa Fe, and was

secretary-treasurer of Lodge 285 of the Brotherhood of Railroad Trainmen; that it was his duty as such officer to notify the general office at Cleveland of the injury of any member of the lodge; that he did so notify that office of the injury of brother H. A. Guderjan; that he talked with Mrs. Guderjan by telephone and she asked him to have someone from the office of the regional attorney call on her; that he called McDonald and De Parcq at Minneapolis and they told him that they would have respondent call on Guderjan; that respondent called and asked Dew to meet him at the Custer Hotel in Galesburg at 3:30 P.M. on a given date in the early part of October, 1945; that respondent did not appear at the hotel at the appointed time and Dew later learned that respondent's train had arrived approximately one and one half hours late; that Dew was compelled to report for work before the train arrived; and that respondent went to the hospital alone to see Guderjan. Respondent also introduced in evidence as exhibit 27, a letter from the Cleveland office of the brotherhood addressed to Dew, bearing date September 28, 1945, which acknowledged receipt of Dew's report of the Guderjan injury and which stated—"and trust it has been possible for you to advise Brother Guderjan of the services that are available to him through the Legal Aid Department of the Brotherhood."

Mrs. Guderjan, on rebuttal, denied ever having any conversation with Dew.

## JAMES K. DEANS

James Deans, who lived at Tilden, Illinois, testified that his son, James K. Deans, was killed in an airplane accident in November, 1944, while on his way home from the South Pacific; that the respondent contacted him at his home in January of 1945 and stated that he was connected with McDonald and De Parcq who were reputable lawyers and who would like to have his case; that respondent showed

him a lot of papers where they had gotten claims for other people who had been killed or injured; that Deans told respondent that he had read a lot about "ambulance chasing" lawyers and that respondent assured him that they were not in that class, but rather, were lawyers who went after railroads, airlines, and big corporations; that respondent told Deans it would not cost him anything; that Deans thereupon signed a retainer contract for respondent and signed papers for procuring letters of administration; and that respondent paid the costs in connection therewith. Two sisters of James K. Deans also testified that the respondent contacted them prior to seeing their father and stated that he wanted to help them get money from the airlines and asked them to talk it over with their father. They further testified that none of them had ever met or heard of respondent, McDonald or De Parcq prior to that time.

To refute this testimony, respondent called as a witness on his behalf, William Lyons, an official of the Progressive Mine Workers and a member of the House of Representatives from the 38th Senatorial District of Illinois. Lyons testified that he knew James Deans and met him in the month of December, 1944, while attending a meeting at the Union Hall; that James Deans told him of his son's death and asked him if he knew a lawyer who might be good in that field; that Lyons told him of the respondent and later called the respondent and told him to see Deans.

James Deans, in rebuttal, testified that he never met William Lyons at the local Union Hall in December of 1944; that he never had a conversation with him concerning his son's death; that he never asked him to recommend a lawyer or be of assistance in that respect; and that he never met Lyons until after the settlement.

There is conflict in the testimony as to the original contact between respondent and his clients. However, much competent and direct testimony concerning the solicitation

of cases by respondent, directly and through solicitors, is uncontradicted. Direct testimony that respondent's solicitors were paid by a division of fees stands unrefuted in the record, except for testimony by respondent's witnesses, disparaging in nature, intended to affect the credibility of complainant's witnesses. In each case, either the respondent or one of his solicitors made one or more calls upon the client in question to obtain retainer contracts for respondent, McDonald, Davis and De Parcq, or other named associates; in most instances the solicitor personally took the client to Chicago without expense to the said client for the purpose of seeing the respondent and receiving a physical examination by respondent's doctors without cost; in all cases either the respondent or one of his solicitors exhibited newspaper clippings and photostatic copies of checks and settlement papers indicating the large verdicts obtained by either the respondent or·his former associates; in connection with the cases of Francis J. Bick, deceased, and Eugene Felter, a guarantee agreement was delivered to Ruth Bick McNichols, widow and personal representative of said decedent and said Felter, bearing the signature of the respondent. In the Teeth Mauldin case, an oral guarantee was made by respondent that if the judgment or settlement was not over $10,000, Mauldin would receive all of it.

There is further testimony in the record, some of it conflicting, as to other solicitations by respondent or his agents. I deem further reference to such testimony needlessly repetitive. In reference, however, to the Wood case, and others to which I have not referred, respondent introduced the testimony of attorneys Graham and McElligott. These men were Chicago lawyers of good standing and were friends and associates of the respondent, who had received and were handling certain business matters for him. The respondent, upon learning that Ericksen was interviewing his former clients and was taking statements from them, thereupon retained Graham and McElligott to

perform a similar service for him. Respondent and these attorneys called at the homes of several of the witnesses in this proceeding, questioned them at length and took pencil notes on the interrogation. A typical example of this procedure occurred in the Wood case. On this occasion, according to the testimony of these attorneys, Wood made the statements heretofore related in that case.

The record contains nothing which would cause me to believe that these lawyers were unfair in their investigation or untruthful in their testimony relative to this transaction. Their testimony must be considered along with the other evidence in this case.

Respondent contends that the proceedings before the commissioners were wholly vitiated because certain commissioners, either personally, or through their law firms represented one or more of the railroads associated in the Railroad Claims Research Bureau, which financed the costly proceedings now before us. Undisputed testimony established that one or more commissioners did represent such railroads. As the majority, I also believe that the respondent was entitled to have the charges against him heard and considered by commissioners who were completely disinterested in the subject matter and the parties involved in this proceeding. If any commissioner was interested in the outcome of this proceeding by virtue of such representation, then it would have been appropriate for him to have disqualified himself.

However, the instant charges were filed in regular form by the fifteen-member Personal Injury Practice Committee of the Chicago Bar Association, and they were heard by the commissioners of this court appointed from the grievance committee and the board of managers of the Chicago Bar Association. There were eight commissioners who heard the case, and in addition, forty others heard respondent's argument on objections to the commissioners' report and acted to overrule the objections and approve the report.

Supreme Court Rule 59 empowers commissioners to receive, inquire into, and take proof concerning complaints against attorneys of this bar. (Ill. Rev. Stat. 1953, chap. 110, par. 259.59.) However, they act only in an advisory capacity, as agents of this court for the purpose of gathering and reporting evidence. (4 I.L.P., Attorneys and Counselors, sec. 195.) Their recommendations are purely advisory, and this court is regarded as a court of initial hearing. *In re McCallum,* 391 Ill. 400.

No claim has been made that the respondent was prejudiced by the rejection of competent evidence, nor does he contend that any of his evidence was not transmitted to this court. That the commissioners performed their essential duties in an able manner is therefore not disputed.

Of course, it is conceivable that a proceeding of this type might be vitiated by proof that it was conducted in such a manner as to prevent fair treatment for the respondent. But this is manifestly not such a case. Here, it is clear that the commissioners gave freely of their time and ability; that they exercised remarkable restraint in a proceeding in which both counsel acted with emotion and vigor; and that they afforded the respondent the fullest opportunity to defend the charges lodged against him, scrupulously preserved and passed on to this court the entire record of the case, carefully analyzed the evidence, and submitted reasoned conclusions. Significantly, the respondent's former counsel, who withdrew from the case after eighteen witnesses had been examined and 1860 pages of testimony had been taken, made a statement to the commissioners in which he thanked them "for their fairness and of the manner of treatment (of him) as counsel for the defendant." In view of all this, it is difficult to maintain a judicial calm when the respondent recklessly accuses our commissioners of having "prostituted themselves" and with having been parties to an "unconscionable conspiracy." These distinguished attorneys served ably and with honor.

They are deserving of the public commendation of their Supreme Court. The following excerpts from the concurring opinion of Justice Knutson in the case of *In re Rerat*, 232 Minn. 1, 44 N.W.2d 273, at page 305, pertinently apply to this proceeding: "In conducting an investigation of this kind, the committee acts as an arm of this court * * *. In so doing, the committee is entitled to fair treatment and a decent respect. * * * I cannot read this record without coming to the conclusion that had there been more devotion to the duty resting upon respondent of fairly assisting the committee in clearing himself of the charges brought against him and less effort spent in seeking to impute to the committee an improper motive in commencing and conducting the investigation, the outcome would be more satisfactory to all concerned. If the standards of the legal profession are to be preserved, it is essential that charges of this kind be investigated, no matter from what source the information comes."

Respondent has likewise made a caustic and vigorous attack upon the Railroad Claims Research Bureau, its paid investigator Edicksen and its paid counsel Taussig, and has denounced the complainant's evidence as unworthy of belief. It is true that the Railroad Claims Research Bureau furnished information upon which the charges against the respondent were based, and aided substantially in the prosecution. But regardless of the source of the evidence, it is our duty to decide the case on its merits. For even "If it were true that the charges would not have been made except for personal hostility, it would neither relieve the court from the duty of investigating the charges nor the respondent from disbarment if they were found to be true." *People ex rel. Chicago Bar Assn.* v. *McCallum,* 341 Ill. 578, 598; *People* v. *Holt,* 279 Ill. 107, 109.

While some of the foregoing testimony as to solicitation is not as clear as I might desire, and much of the testimony is in direct conflict, the respondent did not take the stand

to deny any of the positive testimony of eighteen of complainant's witnesses who testified to facts and statements made in respondent's presence evidencing solicitation and division of fees by respondent. Nor were any of the alleged runners or investigators of respondent called to refute the direct charges of solicitation and division of fees. The presumption which the majority heretofore invoked in connection with the failure of the complainant to introduce testimony by one or more members of the Bick family in rebuttal of the testimony of J. R. Riley, must, in fairness, now be applied to the respondent and his alleged runners and solicitors; and the inference must be drawn that their testimony would be unfavorable to the respondent. 32 C.J.S. page 847.

Counsel for respondent attempts to justify the failure to so testify because "of the indignities involved in this railroad inspired proceeding," and to protest this "improper procedure." These protests do not ring true. Regardless of any alleged improper motivation or malice on behalf of either the commissioners or counsel, I find no indication in the entire record of personal abuse or indignities inflicted upon respondent or his counsel. Respondent's acrimony at the charges against him would appear in better grace if he had taken the stand to brand them false, and I cannot condone his failure to testify in his own defense.

Membership in the bar is a privilege burdened with conditions (*In re Rouss*, 116 N.E. 782,) and in view of the serious nature of the charges against him, and his position as an officer of this court, the choice of silence was not open to him. (*In re Sanitary District Attorneys*, 351 Ill. 206; see also *In re Anastaplo*, 3 Ill.2d 271.) The rule applicable in disbarment proceedings was well stated in the case of *In re Wellcome*, 23 Mont. 450, 59 Pac. 445 at page 452: "If the accused is not guilty, nothing would have been easier than for him to deny all knowledge of the charges laid at his door. His having failed to testify

in his own defense, when he should do so, and deny the statements of Whiteside and Clark, not only justifies, but irresistibly impels this court, upon the evidence before it, which is credible to the conclusion that he is guilty." See also *Fish* v. *State Bar of California*, 214 Cal. 215, 4 P.2d 937; *In re Fenn*, 344 Mo. 586, 128 S.W.2d 657.

I am of the opinion that all of the evidence in the record, coupled with the failure of respondent to testify, leads to the conclusion that respondent engaged in the solicitation of cases, directly, through paid investigators and through clients. In coming to this conclusion, I am not unmindful that many of the complainant's witnesses had developed some real or fancied grievance against respondent, and that the investigator Ericksen was guilty of over-zealousness in obtaining the witnesses. However, it must suffice to say that the record before this court contains the believable, reliable, clear and convincing evidence that is required in proceedings of this character to warrant disciplinary action.

In justice to respondent, I must point out that this record discloses that he has represented his clients properly and has protected their interests. I find him guilty of no moral turpitude in that regard. Indeed, the record affirmatively shows that the respondent is an able lawyer who has achieved success in the field involving Federal Employers Liability Act cases. He has gained a good reputation for his ability, honesty, and integrity among members of the bench and bar, as well as among his personal associates, including the Director of the Railroad Claims Research Bureau and other railroad claims men. Such fact, however, does not overcome the positive evidence of solicitation in this case. *In re Harris*, 383 Ill. 336.

The record here clearly substantiates the findings of the majority that the charges were prepared by George Ericksen and the prosecution conducted by attorney Taussig, both paid employees of the Railroad Claims Research Bureau;

that this group was organized in 1946 by the general solicitors of four or five railroads; that it was later expanded to include at least 21 railroads; that it handled funds and retained an investigator and attorney to probe facts surrounding solicitations and present evidence to bar associations; that the investigator worked on a budget of about $20,000 a year; that George Ericksen was employed by the bureau in 1949, and was instructed to report for work to the personal injury practice committee of the Chicago Bar Association; that the bureau met with the then president of the bar and its general counsel, *amicus curiae* here, in 1949, and an offer was made to give the Chicago Bar Association money to prosecute "ambulance chasers"; that this offer was refused, but the alternative proposal that the bureau employ Ericksen and Taussig to work with the committee was adopted. Kenneth A. Carney, director of the Railroad Claims Research Bureau, testified that bureau meetings were held twice each year at which time railroad investigators would present affidavits relative to solicitation by lawyers and report the results of their probes of the methods of obtaining and handling claims by lawyers representing injured or deceased railroad employees; and that the railroads adopted the practice of settling with claimants without the recognition of lawyers even when they knew that a lawyer was representing the claimant at the time. In view of these facts, I am compelled to the conclusion that this proceeding did not stem originally from a desire for an impartial investigation of unethical practices, designed solely to protect the public and the profession. It may well be that the hostile attitude of the railroads toward attorneys who represented their employees and the attendant activities of claim adjusters tended to develop the climate in which solicitation of the type complained of in this proceeding could thrive. There is substantial evidence in the record, undenied by investigator Ericksen, that he resorted to ruse and artifice in approach-

ing both past and present clients of respondent. He not only sought out the former clients to be witnesses in this proceeding, but also gratuitously called on the latter to advise them to seek other counsel because respondent would soon be disbarred. There is direct evidence that Ericksen attempted to obtain evidence against the respondent by representing himself to be a relative of a person killed in an accident. There is ample uncontradicted evidence in the record to convince this court that Ericksen, acting with credentials of the Chicago Bar Association, was far more interested in discrediting and disbarring respondent than in determining the facts. However, these facts neither relieve the court of the duty of investigating the charges of solicitation, nor of taking proper disciplinary action if they are found to be true. *People ex rel. Chicago Bar Association* v. *McCallum*, 341 Ill. 578, 598; *People* v. *Holt*, 279 Ill. 107, 109.

There is no question but that the type of general solicitation shown in this record, has a strong tendency to lessen the sense of professional obligation to clients and defeat the honorable purposes of the profession. The ethical and social dangers inherent in the practice necessitates its condemnation by this court. Such conduct has long been considered contrary to the ethics of the profession, even though it does not necessarily involve fraud or deceit. We stated in *In re Veach*, 1 Ill.2d 264 at page 272: "Many of the practices prohibited by the canons of ethics do not inherently involve fraud or deceit, but are nevertheless reprehensible. Instances of solicitation will rarely, though they sometimes may, involve either the element of fraud or deceit. Lack of such element does not render the act any less reprehensible, nor does it serve to protect the good reputation of the bar."

After the adoption of the majority opinion eighteen railroads moved this court to reopen the record in this case for the purpose of permitting the movants an opportunity

to defend the charges, characterized as serious, made in the court's opinion against the railroads in general, and the movants in particular; or in the alternative, that the court permit the movants leave to file brief as additional *amicus curiae* in support of petition for rehearing. Suggestions were filed in support of this motion and additional matters in the nature of new and additional evidence against the respondent were filed pursuant to leave of court.

Thereafter, reputable members of the Bar of this State, as officers of this court interested in the due administration of justice, moved for leave to bring to this court's attention newly discovered evidence which allegedly demonstrated that the respondent systematically employed chasers to solicit business for him on a fee-splitting basis, and directed a course of subpoena evasion during prior hearings in this cause to prevent the disclosure of such facts. This motion was accompanied by the sworn statement of O. C. Brown that he had solicited, for the respondent, some of the cases here considered and by letters and sworn statements that the respondent had directed his runners to evade the service of subpoenas.

Motion has likewise been filed herein by George Ericksen for leave to bring to the court's attention new evidence bearing on the matter of improper conduct by respondent in presenting evidence in this case, and to excise from the court's opinion certain statements relating to him, or to reopen the record.

On respondent's objections, all these motions were denied by the majority, even though the case of *In re Donaghy,* 393 Ill. 621, offered ample authority for a re-reference of this case to commissioners of this court to reopen the hearing for the purpose of taking additional evidence and making a supplemental report. Under the allegations of these motions, the record before us is incomplete, and further testimony should have been taken pertinent to the particular charges and defenses involved.

However, even on the present record, I believe that the discharge of the respondent without reproach, save censure for his failure to take the stand and testify, is inadequate.

HERSHEY, C.J., and SCHAEFER, J., concur in the foregoing dissenting opinion.